386 So.2d 1363 (1980)
STATE of Louisiana
v.
Ray JONES, Jr., a/k/a Ray Masters.
No. 66689.
Supreme Court of Louisiana.
June 23, 1980.
Rehearing Denied September 12, 1980.
*1364 William J. Guste, Jr., Atty. Gen., Barbara Rutledge, Asst. Atty. Gen., Paul Carmouche, Dist. Atty., Dale G. Cox, Asst. Dist. Atty., for plaintiff-appellee.
Office of Public Defender, William L. Lowe, Shreveport, for defendant-appellant.
MARCUS, Justice.
Ray Jones, Jr. was indicted by the grand jury for the first degree murder of his two and one-half month old son in violation of La. R.S. 14:30. After trial by jury, he was found guilty as charged. After a sentencing hearing conducted before the same jury that determined the issue of guilt, the jury unanimously recommended that defendant be sentenced to life imprisonment without benefit of probation, parole or suspension of sentence. The trial judge sentenced defendant in accordance with the recommendation of the jury. On appeal, defendant relies on two assignments of error for reversal of his conviction and sentence.

ASSIGNMENT OF ERROR NO. 1
Defendant contends the trial judge erred in allowing in evidence certain inculpatory statements made by him to persons in the hospital on two occasions and to police officers at the police station. He argues that the statements were not freely and voluntarily made after having been advised of his Miranda rights.
During the early morning hours of January 18, 1979, defendant went to the house of Shirley Ruffin, mother of the two and one-half month old victim. Defendant was the victim's father. The child had been crying most of the night and Ms. Ruffin had stayed up caring for the child. Defendant told Ms. Ruffin to go to bed and he walked the child to sleep. He then woke Ms. Ruffin's daughter so that she could prepare for school. Shortly after the daughter left for school, Ms. Ruffin was awakened by defendant. He was nude, had shaven off all his hair and began calling her "Satan." He began choking her until she fell to the floor unconscious. When she regained consciousness, the baby could not be found. The police were called. They located the bruised body of the child in Ms. Ruffin's back yard about twenty to thirty feet from the back door.
In the meantime, the police, in response to a phone call about a man exposing himself, found defendant nude in a vacant house approximately two blocks from Ms. Ruffin's house. He was arrested after a struggle, handcuffed and transported to the LSU Medical Center for observation. Tests performed in the hospital confirmed the presence of phencyclidine (PCP or angel dust) in defendant's system.
At trial, outside the presence of the jury, a predicate was laid by the state for introduction of the inculpatory statements in evidence. Dr. Diana Bienvenue, the psychiatrist who treated defendant at the hospital, testified that when she first examined defendant on January 18, 1979, his condition was one of drug-induced acute psychotic reaction, or a lost contact with reality. She then administered a moderate amount *1365 of the drug Haldol, used to re-establish a patient's contact with reality. She explained that Haldol does not lower one's inhibitions so that one would say something involuntarily that one would not otherwise have said. Defendant was given several dosages of this drug during his first day at the hospital. Dr. Bienvenue testified that when she checked defendant the following morning (January 19, 1979), he was calm, rational, lucid and capable of communicating. During the visit, Dr. Bienvenue asked defendant several questions which are commonly used to determine a patient's contact with reality. After she asked him who he was, where he was, what day it was, and whether he knew why he was in the hospital, defendant told the doctor about the attack on Ms. Ruffin and that he "proceeded to go where the baby was and pick up the baby and start hitting the baby and then threw the baby out of the back door of the house." On the same morning, some time after the statement was made, two police officers came to the hospital and told defendant that he was being charged with simple battery. He was advised of his Miranda rights. Defendant was also told that he was a suspect in the homicide of his son, though no details of the death were described. He was again advised of his rights. At this point, defendant stated that he had nothing to say until he talked to an attorney.
Defendant's second inculpatory statement was made in the hospital on January 24, 1979, just before his release to the police. One of the aides informed a nurse, Gwendolyn Caraway, that defendant was showing signs of distress. Defendant was in a seclusion room which the nursing staff did not enter unless accompanied by a security guard. Nurse Caraway called a university security guard to accompany her. As two aides, the nurse and the guard entered the room, defendant was crying. They testified that he stated in a coherent tone that "he had snuffed out the life of the only thing he ever loved, and that was his son."
The final statement was made by defendant at the police station following his release from the hospital. After Detectives Gary Lindsey and Donald Ashley read defendant his Miranda rights, defendant stated that he understood his rights and would talk to them, but he wanted his lawyer present when he did so. The officers explained that an attorney was not available at the moment but that one would be appointed for him as soon as he was transferred to the parish jail. Detective Lindsey then told defendant that "God takes care of little babies" and that "the baby was already in heaven." Defendant then asked Lindsey if he was a religious man. After the detective stated that he was "not as religious as I should be," defendant told the officers how he choked Ms. Ruffin and hit the baby and threw him into the back yard.
At the conclusion of the predicate, the trial judge found that defendant's statements made at the hospital were free and voluntary and were not made as a result of "custodial interrogation" requiring the Miranda warnings. He also found that the statement made at the police station was freely and voluntarily made. He concluded that the "police officers did not set out to trap this man, to make a statement," but rather that defendant changed his mind after invoking his Miranda rights and decided to confess to what he had done. Accordingly, the trial judge ruled all the inculpatory statements made by defendant admissible in evidence.
Before a confession can be introduced in evidence, the state has the burden of affirmatively proving that it was free and voluntary and not made under the influence of fear, duress, intimidation, menaces, threats, inducements or promises. La. R.S. 15:451. It must also be established that an accused who makes a confession during custodial interrogation was first advised of his Miranda rights. Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). In Miranda, the United States Supreme Court observed: "By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been ... deprived of his freedom of action in any significant way." *1366 Spontaneous and voluntary statements, not given as a result of police interrogation or compelling influence, are admissible in evidence without Miranda warnings even where a defendant is in custody. State v. Robinson, 384 So.2d 332, No. 65,722 (La., May 19, 1980); State v. George, 371 So.2d 762 (La. 1979); State v. Thornton, 351 So.2d 480 (La. 1977); State v. Sockwell, 337 So.2d 451 (La. 1976); State v. Thomas, 310 So.2d 517 (La. 1975); State v. Higginbotham, 261 La. 983, 261 So.2d 638 (1972); State v. Hall, 257 La. 253, 242 So.2d 239 (1970). The Supreme Court further stated in Miranda: "Once warnings have been given, the subsequent procedure is clear. ... If the individual states that he wants an attorney, the interrogation must cease until an attorney is present." The admissibility of a confession is in the first instance a question for the trial judge. His conclusions on the credibility and weight of the testimony relating to the voluntariness of a confession will not be overturned unless they are not supported by the evidence. State v. Hutto, 349 So.2d 318 (La. 1977).
In the instant case, the first statement made by defendant to Dr. Bienvenue on the morning after his admission to the hospital was voluntary and unsolicited. Defendant was calm and rational and clearly capable of communicating. His statement was the product of a free and rational choice. Moreover, not being subjected to interrogation by a police officer, Miranda warnings were not required. Hence, the trial judge properly admitted this statement in evidence.
The second statement was likewise properly admitted in evidence. It was not made in response to police interrogation. The university security guard was present as a protective measure for the hospital staff and he did not question defendant. The statement was unsolicited and the evidence was clear that defendant was rational and aware of what he was saying. As in the case of the earlier statement, no Miranda warnings were required.
Finally, the admissibility of the statement made by defendant at the police station upon his release from the hospital presents a closer question. The United States Supreme Court recently defined the term "interrogation" in State of Rhode Island v. Innis, ___ U.S. ___, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980), in a case remarkably similar to the present one. In Innis, the defendant was arrested for the murder of a cab driver and when given his Miranda rights, he replied that he wanted to speak to a lawyer. While defendant was being transported by police officers from the arrest scene to the police station, one policeman said to the other in reference to the missing murder weapon, "there's a lot of handicapped children running around in this area, and God forbid one of them might find a weapon with shells and they might hurt themselves." At this point, the defendant, seated in the rear of the patrol car, stated that he would show them where he had hidden the murder weapon. The Court noted that not all statements obtained by the police after a person has been taken into custody are the product of interrogation. In concluding that the statements in the patrol car did not represent "interrogation," the Court stated:
We conclude that the Miranda safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent. That is to say, the term "interrogation" under Miranda refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect. The latter portion of this definition focuses primarily upon the perceptions of the suspect, rather than the intent of the police.... A practice that the police should know is reasonably likely to evoke an incriminating response from a suspect thus amounts to interrogation. But, since the police surely cannot be held accountable for the unforeseeable results of their words or actions, the definition of interrogation can extend only to words or *1367 actions on the part of police officers that they should have known were reasonably likely, to elicit an incriminating response. ___ U.S. at ___, 100 S.Ct. at 1689-90. [Footnotes omitted.]
In the instant case, after being advised of his Miranda rights, defendant stated that he wanted to tell about it but would like a lawyer present. He was told that one would be appointed as soon as he arrived at the parish jail. Nonetheless, he again said, "well I want to tell you about it." It was at this point that Detective Lindsey made a declaratory statement that "God takes care of little babies" and that "the baby was already in heaven." Defendant then asked Lindsey if he was a religious man to which he replied "not as religious as I should be." At this point, defendant told the officers about what had happened. Although Detective Lindsey stated that he felt defendant wanted to tell about it as a relief and he naturally wanted to find out for himself, we are unable to say that the original statement made by the officer was such as he "should have known that it was reasonably likely to elicit an incriminating response." Rather, the statement was more in the nature of consolation. Under the circumstances, we conclude that defendant was not "interrogated" within the meaning of Miranda. Moreover, we consider that defendant simply changed his mind after invoking his Miranda rights and decided that he wanted to relieve himself of his burden by telling the police officers about it at that time rather than waiting until later when an attorney would be appointed to represent him. This was the conclusion reached by the trial judge and we agree.
Even assuming that defendant's statement to the police officers was improperly introduced in evidence, we consider the error harmless. Before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt. Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). In Null v. Wainwright, 508 F.2d 340 (5th Cir.), cert. denied 429 U.S. 970, 95 S.Ct. 1964, 44 L.Ed.2d 459 (1975), the court was faced with a statement that had been improperly admitted because it was obtained by police officers who failed to advise defendant of his Miranda rights. The court found the other evidence overwhelming and held the erroneous admission harmless beyond a reasonable doubt, citing Chapman v. California, supra.
In view of the testimony of Dr. Bienvenue, who witnessed defendant's first inculpatory statement, and the testimony of the hospital aide, nurse Caraway and the university security guard, who witnessed the second inculpatory statement, we find the third inculpatory statement, if erroneously admitted, was harmless error beyond a reasonable doubt. Four testimonials of precisely the same statement on two prior occasions together with other evidence adduced at the trial constitute overwhelming evidence that defendant was guilty of the crime for which he was convicted.
Assignment of Error No. 1 is without merit.

ASSIGNMENT OF ERROR NO. 2
Defendant contends the trial judge erred in restricting his cross-examination of a witness.
During the predicate for introduction introduction of inculpatory statements made by defendant outside the presence of the jury, defense counsel was questioning Dr. Bienvenue regarding the background information of a patient that she considered necessary to form her diagnosis of defendant's condition. Defense counsel asked:
So that if you got bad information on your admissionin other words, if let's say for example you had one person who was the identified patient say in a family, and one person was brought in for admission, and other family members told you that they were sick, is it a potential situation that you could get bad information concerning that patient from others in the family?
The state's objection on the ground of relevancy was sustained. The only relevant issue was whether defendant's mental state *1368 rendered him incapable of making a free and voluntary statement. There was no evidence that "bad information" had been furnished when defendant was admitted to the hospital. Under the circumstances, it is difficult for us to understand the relevancy of defendant's question. The trial judge is vested with a sound discretion to stop prolonged, unnecessary and irrelevant examination of a witness, whether such examination be direct or cross. La.R.S. 15:275. We do not find that the trial judge abused his discretion in this instance. Assignment of Error No. 2 is without merit.

DECREE
For the reasons assigned, defendant's conviction and sentence are affirmed.
DENNIS, J., concurs.