464 So.2d 760 (1984)
STATE of Louisiana
v.
Edward Peyton ROBERTSON.
No. KA 84-0715.
Court of Appeal of Louisiana, First Circuit.
December 28, 1984.
Rehearing Denied February 21, 1985.[*]
Writ Denied April 19, 1985.
*761 John Sinquefield, Asst. Dist. Atty. Ad Hoc. Baton Rouge, for State, appellee.
Nathan S. Fisher, Baton Rouge, for defendant-appellant.
Before COLE, CARTER and LANIER, JJ.
LANIER, Judge.
The defendant, Edward Peyton Robertson, Jr., was charged by grand jury indictment with reckless handling of hazardous materials in violation of La.R.S. 32:1518. After a trial by jury, he was found guilty as charged. He was subsequently sentenced to serve five years at hard labor in the custody of the Louisiana Department of Corrections, which sentence was suspended and he was placed on supervised probation for a period of five years with the following special conditions:
(1) serve one year in the parish jail;

*762 (2) pay a fine of $10,000 and the costs of prosecution;
(3) attend a substance abuse clinic; and
(4) accept no employment with any railroad company during the term of probation.
The district court authorized the probation to be served in the State of Mississippi. This appeal followed.

FACTS
On September 28, 1982, the defendant was the engineer of a train owned by the Illinois Central Gulf Railway which was hauling hazardous materials. Near the Livingston community in Livingston Parish, Louisiana, this train derailed and exploded. Some of the hazardous material burned for several days, and some of the hazardous material was spilled in the area of the railroad track. Residents of the Livingston community were required to leave their homes for an extended period of time for their safety.

IMPROPER COMPOSITION OF PETIT JURY VENIRE
The defendant contends persons were unlawfully excused from his petit jury venire by the Clerk of Court, his employees and other unknown persons instead of by the district judge as required by La.C.Cr.P. art. 783. He contends this is a legal defect in the proceedings which constitutes reversible error as a matter of law and entitles him to a mistrial as provided in La.C.Cr.P. art. 775(3). He further contends this practice resulted in a petit jury venire that was not selected impartially from a fair cross section of the community as required by La. Const. of 1974, art. I, § 16 and La.C. Cr.P. art. 408.[1]
The trial of this matter commenced on February 7, 1984. When the names of the prospective jurors on the petit jury venire were being called at the beginning of the trial, counsel for the defendant observed on the record to the court that numerous persons did not appear and he wanted to find out why they were excused and who excused them. After the noon recess, counsel for the defendant advised the court that the petit jury venire of 400 names had 36 names scratched out and he had information these persons were excused by the Clerk of Court of Livingston Parish, and not by the judge. Counsel for the defendant then asked for a mistrial or, in the alternative, that the entire petit jury venire be quashed. Defense counsel also requested an evidentiary hearing to prove his allegations. The district court judge agreed the only person authorized to excuse prospective jurors was the judge, or one of his designated employees, and stated he did not designate anyone other than his secretary to assist him in the excuses. However, the judge denied the motions on the ground a sufficient number of prospective jurors were present to impanel a six-person jury. The judge indicated he would conduct a hearing later in the proceedings to determine what was the problem.
On February 14, 1984, after the jury was retired to begin deliberations, the court conducted an evidentiary hearing on the defendant's claim of improper composition of the petit jury venire. Lucius Patterson testified he was the Clerk of Court of Livingston Parish and the petit jury venire of 400 persons was selected under a computer system. Patterson had been Clerk of Court for eight years, and during this time he had excused persons from jury duty (from the petit jury venire after it was selected) if they were elected officials, lived out of State, were over 70, were in the military or were ill. Thirty-eight persons had been excused from the petit jury venire. Patterson testified he excused eight persons from jury duty: one because she had an infant child, La.C.Cr.P. art. 783(B); two for medical reasonsone because she was in the hospital for foot surgery who also had a medical certificate showing that she had angina, hypertension and diabetes and one with no medical certificate whom he personally knew to have a heart problem, *763 La.C.Cr.P. art. 401(4); and one for whom he had no reason. The jury summonses show Patterson excused Mary S. Hoover because she was the librarian at the Maurepas School, La.C.Cr.P. art. 783(B). There is no evidence in the record to show to whom the remaining three excuses were given or what were the reasons for the excuses. Three of the judges of the Twenty-First Judicial District Court (Ford, Causey and Dufreche) had given him authority to act on their behalf in excusing jurors. He did not recall if the judge in the instant case (Fogg) had given him authority to grant excuses. Judge Rowe on several occasions had told him not to grant excuses. Patterson further testified it was his understanding the Sheriff of Livingston Parish also granted juror excuses. Patterson only granted excuses he felt were valid. Patterson indicated some of his minute clerks might also grant excuses. In his testimony, Patterson stated as follows:
Q. When you excuse these people, do you make a record of it in truth and fact those
A. I have a ledger, yes sir.
Q. And the persons that are excused are provided to the Judges before trial?
A. Yes sir.
Q. And if they don't agree with the excusing then they don't have the Sheriff or whoever notify the person to be here?
A. Yes sir, whatever, yes sir.
Q. So, in a sense you feel that you're not making the final decision?
A. No, sir, I'm not making a final one, but these people are not hereIf they are in the hospital or sickness, then they can't be here.
Willie Graves, the Chief Criminal Deputy for Livingston Parish, testified the Sheriff's Office received excuses from prospective jurors and presented them to the court for approval. Graves stated the judge made the final decision on each excuse.
Judge Samuel T. Rowe, Division C of the Twenty-First Judicial District Court, testified that after he was elected judge in 1978 he found out jurors were being excused contrary to law. He attempted to eliminate the problem but had not been totally successful. Rowe had given authority only to three of his court personnel to act on excuses. The Judicial Administrator was one of these three.
Counsel for the defendant also introduced into evidence copies of 38 juror summonses to indicate which jurors had been excused prior to trial. Thirty-three of these summonses have notations indicating why the prospective juror was excused, but no reason is given on five of the summonses. These summonses do not indicate when the excuses were granted, and, with the exception of one, do not indicate who granted the excuses.
The qualifications required for a juror in a criminal jury trial are set forth in La.C.Cr.P. art. 401. Ten of the summonses indicate the prospective juror was not qualified to serve because of residency, La.C. Cr.P. art. 401(1); Eleven of the summonses indicated the juror was not qualified because of a mental or physical infirmity (some had medical certificates attached and some did not), La.C.Cr.P. art. 401(4); one summons indicated the juror was not a citizen of the United States, La.C.Cr.P. art. 401(1); and one summons indicated the juror was not qualified because he was on probation for conviction of a felony, La.C. Cr.P. art. 401(5).
The exemptions from jury duty are established in Rule XXV of the Louisiana Supreme Court Rules. La. Const. of 1974, art. V, § 33(B); La.C.Cr.P. art. 403. The summonses show that one person was exempt because he was an elected official, Rule XXV, § 2(a); one was exempt because he was a fireman, Rule XXV, § 2(c); and one was exempt because he was a policeman, Rule XXV, § 2(c).
La.C.Cr.P. art. 783(B) provides that a prospective juror may be excused from jury duty if such service would result in undue hardship or extreme inconvenience. The summonses show that two prospective women jurors were excused for having *764 small children, State v. Perry, 420 So.2d 139 (La.1982); and five prospective jurors were excused for work-related problems (self-employed, school librarian and working offshore).
The parties stipulated Judge Fogg never gave authority to anyone to excuse any persons on his jury venires. After hearing the above evidence, the district court judge observed he initially denied the motions because he felt the defendant could receive a fair jury and a fair trial and he did not see any necessity to make another ruling. After the jury verdict, the defendant asserted this assignment of error as an allegation in a motion for a new trial, which was denied.
La. Const. of 1974, art. I, § 16 gives every person charged with a crime a right to an impartial trial in the parish where the offense or an element of the offense occurred. La.C.Cr.P. art. 419 provides as follows:
A general venire, grand jury venire, or petit jury venire shall not be set aside for any reason unless fraud has been practiced or some great wrong committed that would work irreparable injury to the defendant.
This article does not affect the right to challenge for cause, a juror who is not qualified to serve.
The defendant has the burden of establishing fraud or some irreparable injury in the jury selection process. State v. Brown, 414 So.2d 726 (La.1982). The mere fact that prospective jurors composing a petit jury venire were excused or absent does not establish fraud or irreparable injury. State v. Smith, 430 So.2d 31 (La.1983). A defendant in a criminal jury trial has no right to a trial by a particular jury or juror, but only to a trial by a competent, impartial jury. State v. Coleman, 410 So.2d 1079 (La.1982). Due process in a criminal jury trial requires only that the defendant be afforded a jury from which there has been no arbitrary exclusion of any particular group of individuals. State v. Gardette, 352 So.2d 212 (La.1977); State v. Cage, 337 So.2d 1123 (La.1976).
La.C.Cr.P. art. 783(A) provides as follows:
The court may excuse a member of the petit jury venire at any time prior to the time he is sworn as a juror to try a particular case. The panel shall be selected from the remaining members of the petit jury venire. The court, either on its own motion, or that of the state or a defendant, may order the attachment of an absent and unexcused petit jury venireman. (Emphasis added).
The evidence shows the Clerk of Court excused eight prospective jurors prior to trial, he had no authority from the district court judge to grant such excuses and four of the eight excuses were granted for reasons authorized by law. The defendant did not call any of the 38 excused jurors to testify at the evidentiary hearing on the motions, nor did he attempt to attach these jurors to guarantee their appearance at the voir dire. Even without these 38 prospective jurors, the petit jury venire consisted of 362 persons. The court minutes and the transcript of the voir dire indicate only 28 persons were questioned before a jury was obtained: ten persons were excused by the court, four were challenged by the State, six were challenged by the defendant, six served as jurors and two served as alternate jurors. In this factual posture, the defendant has failed to carry his burden of showing the unlawful granting of juror excuses by the Clerk of Court resulted in a systematic exclusion of an identifiable group or class which denied him a fair cross section of the community on his jury. Cf. State v. Boyd, 359 So.2d 931 (La.1978); State v. Badon, 338 So.2d 665 (La.1976); State v. Morgan, 315 So.2d 632 (La.1975); State v. Guin, 444 So.2d 625 (La.App. 3rd Cir.1983). Although it was error for the Clerk of Court to grant juror excuses, this error under the facts of the instant case did not affect a substantial right of the defendant and was harmless. La.C.Cr.P. art. 921.
This assignment of error is without merit.

*765 CONSTITUTIONALITY OF LA.R.S. 32:1518
The defendant contends the statute he is charged with violating, La.R.S. 32:1518, is overbroad, vague, ambiguous, indefinite and fails to provide adequate or fair prior notice of the nature of criminal conduct and is therefore unconstitutional. Specifically, he contends the phrase "in a manner that endangers or could endanger human life or health" fails to give adequate notice to individuals what conduct is proscribed and fails to provide an adequate standard for those charged with determining the guilt or innocence of an accused to follow.
La.R.S. 32:1518 provides as follows:
A. No person shall transport, transfer, load, or unload, nor shall any person cause said transport, transfer, loading, or unloading of a hazardous waste or hazardous material as defined in R.S. 32:1502, in a manner that endangers or could endanger human life or health.
B. Any person who willfully violates this Section shall, upon conviction, be guilty of a felony and be fined or imprisoned in accordance with R.S. 32:1514(B).[2]
The indictment charges the defendant with violating La.R.S. 32:1518 as follows:
on or about September 28, 1982, within the jurisdiction of this Honorable Court, he knowingly transported hazardous materials, to wit: gaseous and liquid chemicals including Vinyl Chloride and Methyl Chloride in a manner that endangered human life and health in that he being the Engineer in charge of the operation of the engines of an Illinois Central Gulf Railroad Train pulling tank cars loaded with the said hazardous materials; permitted an unqualified, untrained person to operate said train; operated and permitted said train to be operated at an excessive speed; was under the influence of alcohol during the operation of the train; and left the controls of the train during its operation, ...
Thus, the elements of the offense as charged in the indictment are as follows:
(1) Edward Peyton Robertson, Jr. on September 28, 1982, in Livingston Parish, Louisiana;
(2) transported hazardous materials consisting of gaseous and liquid chemicals including Vinyl Chloride and Methyl Chloride;
(3) the transportation was in a manner that endangered human life and health because as Engineer in charge of the train pulling tank cars loaded with the hazardous materials, the defendant permitted an unqualified and untrained person to operate the train, operated and permitted the train to be operated at an excessive speed, was under the influence of alcohol during the operation of the train and left the controls of the train during its operation; and
(4) the defendant's conduct was willful.
Every statute is presumed constitutional, and the burden of clearly establishing its unconstitutionality rests upon the party attacking it. State v. Skinner, 358 So.2d 280 (La.1978); In Interest of Voyles, 417 So.2d 497 (La.App. 1st Cir. 1982), writ denied, 420 So.2d 981 (La. 1982). A statute should be given a genuine construction according to the fair import of its words taken in their usual sense in connection with the context. State v. Heck, 307 So.2d 332 (La.1975). A detailed specification of the various ways in which the crime can be committed is not required to sustain the constitutionality of a penal statute; it suffices that the phraseology has a wellknown or commonly-understood meaning. State v. Gisclair, 363 So.2d 696 (La.1978). In State v. Dousay, 378 So.2d 414, 416-417 (La.1979), appears the following:
The constitutional requirement of definiteness which must be satisfied by a *766 regulation which is accompanied by penal sanctions emanates from the due process clauses of the United States and Louisiana Constitutions, from Article 1, § 13 of the Louisiana Constitution, Rights of the Accused, which contains the guarantee that `[i]n a criminal prosecution, an accused shall be informed of the nature and cause of the accusation against him,' and from Article 1, § 16 of the Louisiana Constitution, Right to a Fair Trial.
Two fundamental concepts are embodied in the principle that the vagueness of a criminal enactment may render it unconstitutional. The first of these is that individuals must be given adequate notice that certain contemplated conduct is proscribed and punishable by law. The second is that adequate standards must be provided for those charged with determining the guilt or innocence of an accused....
With regard to the requirement of adequate notice, this court has held that the constitutional guarantee that an accused shall be informed of the nature and cause of the accusation against him requires that a penal statute must describe unlawful conduct with sufficient particularity and clarity that ordinary men of reasonable intelligence are capable of discerning its meaning and conforming their conduct thereto.... The due process clause of the Louisiana Constitution has also been found to demand that words and phrases employed in statutes or regulations may not be so vague and indefinite that any penalty prescribed for their violation constitutes the taking of liberty or property without due process of law.... Similarly, a conviction under a criminal enactment which does not give adequate notice that the conduct charged is prohibited is violative of the due process clause of the Fourteenth Amendment of the United States Constitution....
Both the constitutional guarantees of procedural due process and the right to a fair trial embodied in Article 1, § 16 of the Louisiana Constitution also require that a criminal enactment contain an ascertainable standard of guilt and that it `mark[s] boundaries sufficiently distinct for judges and juries to administer the law in accordance with the legislative will.' ... The United States Supreme Court has held that `[a] law fails to meet the requirements of the Due Process Clause if it is so vague and standardless that it ... leaves judges and jurors free to decide, without any legally fixed standards, what is prohibited and what is not in each particular case.' ...
The constitutional requirement of definiteness is satisfied when the language of a criminal enactment `has a generally accepted meaning such that a person of ordinary intelligence would be given fair notice of what conduct is forbidden,' ... or when `the crucial words [or] phrases in the criminal statute have a fixed and definite meaning for a person of ordinary intelligence.' ... When, as here, administrative regulations are accompanied by criminal sanctions, the United States Supreme Court has stated that `businessmen must not be left to guess the meaning of regulations.'
(Citations omitted).
In State v. Clark, 325 So.2d 802 (La. 1976), the defendant contended La.R.S. 14:110 was unconstitutionally vague by proscribing the offense of aggravated escape "under circumstances wherein human life is endangered." In upholding the constitutionality of this statute, the court observed as follows:
The phrase `under circumstances wherein human life is endangered' offers a sufficiently clear and definite standard of criminal conduct. The words have a commonly known and well-understood meaning and application. Generic terms are often used by the legislature in defining criminal conduct. A statute need not set out every circumstance and variation in conduct which may be a violation thereof. City of Baton Rouge v. Norman, 290 So.2d 865 (La.1974). It suffices that the words or phrase used denote to a person of ordinary intelligence the conduct proscribed in the statute. La. *767 R.S. 14:110, subd. B meets these tests. Defendant's challenge to the constitutionality of the statute fails in this case. Clark, 325 So.2d at 811
In State v. Baron, 416 So.2d 537 (La. 1982), the defendant contended that La.R.S. 14:51 was unconstitutionally vague because it proscribed the offense of aggravated arson in situations where it was "foreseeable that human life might be endangered." In upholding the constitutionality of this statute, the court observed as follows:
At the time of the offense, La.R.S. 14:51 provided that aggravated arson is `* * * the intentional damaging by any explosive substance or the setting fire to any structure ... or movable whereby it is foreseeable that human life might be endangered.' La.R.S. 14:2(5) provides that, in the criminal code, the word `foreseeable' refers to `that which would ordinarily be anticipated by a human being of average reasonable intelligence and perception.' This is the sense in which the word foreseeable is commonly understood. Accordingly, the criminal code makes punishable as aggravated arson the intentional setting fire to any structure or movable whereby a person of reasonable intelligence and perception would anticipate that human life might be endangered. These terms are not too vague to serve as a constitutionally adequate definition of a crime.

Baron, 416 So.2d at 538.
After reviewing the above authorities and La.R.S. 32:1518, we conclude that the statute provides both fair notice to an accused of what conduct is forbidden and a sufficient standard for the trier of fact to determine guilt or innocence.
This assignment of error is without merit.

ADMISSIBILITY OF INCULPATORY STATEMENT
Defendant contends that the district court erred in denying his motion to suppress his statements on the grounds that: (1) he was arrested and questioned without having been advised of his Miranda rights; (2) his statement was made as the result of impermissible inducements and promises; and (3) the investigating officers continued to question defendant after he indicated his desire to end the interrogation and speak to his attorney.
The Louisiana State Police conducted interviews with defendant on October 12, 1982, and on October 14, 1982.[3] The October 12th interview was conducted by Arnette Heintze of the Louisiana State Police, who was assisted by Trooper Paul Melander of the Hazardous Material Section of the State Police. The defendant voluntarily came to the Region I State Police Headquarters in Baton Rouge for the interview. He was not under arrest and was not under subpoena. Heintze did not have probable cause to arrest the defendant at that time. The interview started at 10:00 a.m. and was concluded at 10:35 a.m. Before recording the defendant's statement, Heintze advised him he was investigating the derailment and the possibility of violations of law. The recording of the statement shows the defendant was given a Miranda warning by Heintze both verbally and in writing. The defendant executed a written waiver of rights and verbally agreed to its contents. The defendant then gave an exculpatory statement. At the end of the statement, the defendant acknowledged it was given freely, voluntarily and without "threats, pressure or coercement of any kind".
Heintze and another (unidentified) officer took a statement from Janet Byrd on October 10, 1982. Byrd advised she met the defendant and Russell Reeves (the train brakeman) at the Prince Murat Motel in Baton Rouge during the early morning hours of September 28, 1982. Byrd was also a railroad employee. She further advised that the defendant and Reeves were not drinking and she took them to work. She also gave statements to a railroad special agent and the National Transportation *768 Safety Board on that day. After giving these exculpatory statements, she decided to consult her attorney the next day. Pursuant to her attorney's advice, on October 12, 1982, Byrd gave another statement (apparently to a railroad official) at her attorney's office. Heintze was present in the office but not at the taking of the statement; however, the contents of the statement were apparently made available to him. In her statement, Byrd said the defendant had been drinking alcoholic beverages prior to boarding the train on September 28, 1982, she went on the train (although she was not authorized to do so), she was in the engineer's seat at the time of the accident and she had the train's throttle at its maximum. Based on this and other information, a warrant was obtained for the defendant's arrest for reckless handling of hazardous materials during the early morning of October 14, 1982.
On October 14, 1982, the defendant, on request, again came to Region I Headquarters to be interviewed by Heintze and Melander. He was not under subpoena or arrest, but Heintze had the warrant for his arrest. The interview commenced at 10:35 a.m. and was tape recorded. Heintze stated for the record that the defendant was the engineer on the train that derailed in Livingston on September 28, 1982. He did not tell the defendant he had a warrant for his arrest for reckless handling of hazardous material. Heintze gave defendant a Miranda warning both verbally and in writing. The defendant agreed to speak with the officers but declined to sign the waiver of rights until the interview was over. Initially, the defendant stuck with the exculpatory statement he gave previously. During this portion of the interview, the following exchange took place:
Robertson Do I get one of those?
Heintze Why should I give you a cigarette, you aren't giving me anything.
Robertson Well, this is true.
Heintze Give me something and I will give you a cigarette.
Robertson Well, I can buy some.
Heintze What?
Robertson I got some.
Heintze Come on, tell me something and I will give you a cigarette.
Robertson No, I ain't got anything to tell you.
Heintze Yes you have.
Robertson I really really don't.
Heintze Yes, yes you have. I like you Peyton.
This portion of the interview was concluded at 11:05 a.m.
From 11:12 a.m. to 11:43 a.m., Heintze interviewed Russell Reeves. Reeves admitted what happened to Heintze (apparently confirming Byrd's version of the events). Heintze returned to the room where the defendant was, started recording again and reconfirmed the defendant understood his constitutional rights. Heintze then told the defendant he had the stories of Reeves and Byrd. He advised the defendant he was under arrest for reckless handling of hazardous materials at 12:04 p.m. The defendant told Heintze he had to return to McComb, Mississippi, (defendant's home town) the next day for his uncle's funeral. The following conversation then took place:
Robertson I am still under arrest?
Heintze You are still under arrest.
Robertson I am not going to be allowed to go back to Mississippi?
Heintze Not today, not today.
Robertson Why?
Heintze Because you are going to be booked into Livingston Parish Sheriff's Office Jail. Your bond is five hundred thousand dollars.
Robertson Driving the train?
Heintze No, you tell me, you tell me the story, tell me, you say she wasn't driving the train, you tell me.
Robertson That's what I say.
Heintze You tell me, lay it on me.
Robertson That's her story.
Heintze I want to hear your story.
Robertson She was not driving that train.
Heintze I want to hear your story.

*769 Robertson If I am not going to be entitled to go back to McComb to go to the funeral, I haven't got anything else to say.
Heintze I'm not saying you can't.
Robertson No, you just got through saying I couldn't.
Heintze I'm saying you can't go back today and it all depends.
Robertson How'd he get back today?
Heintze That is really out of my hands, I might be able to talk to the Judge and seeing about getting that bond lowered, if I have reason .. the Judge has to make the decision, he has to decide the bond.
Robertson I'm not going to be able to go back with these railroad people?
Heintze No.
Robertson Well, how am I going to get back?
Heintze You won't be going back evidently, right now.
Robertson I can't get back up there?
Heintze Not at this moment, no.
Robertson Hell, man, I'm not talking about this
Heintze It all depends
Robertson
Heintze Bull.
Robertson Either I can go back up there now and go to the funeral and you can do with me what you want to or you can just lock me up now and the conversation is over with. And I will just have to call and see what I am entitled to and get my lawyer down here.
Heintze We need to get this matter cleared up. I want to hear your story.
Robertson I have said all I am going to say until, I mean, if I am not going to be able to go back to McComb, I've said all I am going to say.
Heintze I don't want you to feel like I am holding you going back to McComb because
Robertson No, you said I could not go.
Heintze Because I have really no control over that.
Robertson Well, then you said I couldn't go.
Heintze The only thing I can do is talk to the Judge and see about getting that bond lowered.
Robertson That's not good enough.
Heintze What do you mean it's not good enough?
Robertson It's not good enough. I want to go back to McComb today and if that's not possible, like I said, I want an attorney and we'll go from there.
Heintze I am going to go ahead and conclude this taped interview. The time now is approximately 12:08 PM. On this 14th day of October, concluding this statement right now. END
Apparently, Heintze then went and got Reeves and brought him back to the defendant's interview room. Reeves told the defendant "I told them, it's all over". Thereafter, the transcription of the tape recording shows the following:
Heintze Today's date is still October 14, 1982, the time now is approximately 12:20, this is Arnette Heintze, Louisiana State Police Region I. In the room with me is TFC Paul Melander, Hazardous Materials Section. We are interviewing Peyton Robertson concerning the train derailment in Livingston, LA on September 28, 1982.
Peyton, we advised you of your Constitutional Rights earlier this afternoon.
Robertson Yeah and I am still aware of those.
Heintze I would like to go ahead and advise you again.
Before we ask you any questions, you must understand your rights. You have the right to remain silent. Anything you say can be used against you in a court or other proceedings. You have the right to talk to a lawyer for advice before we ask you any questions and to have him with you during questioning. You have this right to the advice and presence of a lawyer even if you can not afford to hire one. In such a case you have a right to have a court appointed attorney present at *770 the interrogation. If you wish to answer questions now without a lawyer present, you have the right to stop answering questions at any time. You also have the right to stop answering at any time until you talk to a lawyer. I have read the statement of my rights shown above and I understand what my rights are.
Is that correct?
Robertson That's correct. Just a second.
Heintze I am not going to flip the tape off.
Robertson I want to ask you one thing, I know this thing is, I know this thing, you know, like you said, I am going to be under bond and this that and the other, is it going to court?
Heintze This case will be forwarded to the District Attorney. He decides what action to take.
Robertson Is there a possibility that I am going to do time over this thing?
Heintze There is that possibility, I am not going to lie to you, there is a possibility, but you have got to look at your past record. Do you have any serious felony convictions?
Robertson No, nothing, still and all I want to know where I stand right on top, I mean, I knew it could possibly get to court somewhere.
Heintze There is no cut and dry answer to it Peyton, I am telling you right now, there is no cut and dry answer to it.
Robertson Okay, alright.
Heintze Did you understand your rights?
Robertson I understand my rights.
Heintze Okay the time now is approximately 12:22 AM [sic], would you care to sign right there?
Robertson Yeah.
Heintze The bottom part of that is a Waiver of Rights, it's optional if you care to
Robertson Can I sign it
Heintze Later?
Robertson Well, it doesn't really make
Heintze Yes, it doesn't make much difference.
Robertson Well....
Heintze You still get the same rights.
Robertson I am still entitled to a lawyer if it goes to court or whatever.
Heintze Yes.
Robertson This is just for this right here, I just want to be, you know.
Heintze You always have the right to an attorney.
Robertson This is just waiving them for this thing right here.
Heintze Talking right now.
Robertson Okay, alright.[4]
The defendant then gave an inculpatory version of the events of September 28, 1982. He admitted he had been drinking prior to leaving Baton Rouge, Janet Byrd was in the engineer's seat at the time of the derailment and the train was going approximately forty miles per hour at the time of the derailment (exceeding the speed limit of twenty-five miles per hour at that location). This portion of the interview ends at 12:42 p.m. with the following:
Heintze We will go ahead and conclude this taped interview. You understood your rights throughout this interview?
Robertson I sure have.
Heintze You understand it's been tape recorded?
Robertson Right.
Heintze And this statement has been given free and voluntarily?
Robertson True.
Heintze No threats or coercion has been used against you?
Robertson None.
The defendant filed a motion to suppress his statements. This motion was denied by the district court.
*771 Even assuming that defendant's statements were improperly taken, the admission of these statements was harmless error beyond a reasonable doubt. Introduction of an otherwise inadmissible statement may constitute harmless error when accompanied by the introduction of a statement free of constitutional taint and of equal or greater inculpatory cast. Null v. Wainwright, 508 F.2d 340 (5th Cir.), cert. denied, 421 U.S. 970, 95 S.Ct. 1964, 44 L.Ed.2d 459 (1975); State v. Mitchell, 437 So.2d 264 (La.1983); State v. Redic, 392 So.2d 451 (La.1980); State v. Jones, 386 So.2d 1363 (La.1980).
In the instant case, the defendant testified on his own behalf at trial. His testimony is free of any constitutional taint and contains basically the same facts as the inculpatory statement of which he now complains. Both his testimony at trial and inculpatory statement focus on three major questions: (1) where was Byrd at the time of the derailment; (2) how fast was the train traveling at the time of the derailment; and (3) when, where, and how much alcohol had defendant consumed prior to the derailment?
Concerning Byrd's location at the time of the derailment, Robertson testified at trial, as follows:
Q. All right. Now, back to my question. Did you allow her to sit in the engineer's seat during the trip from Baton Rouge to the derailment?
A. Yes, I did.
Q. And when did you allow her to sit in the engineer's seat?
A. I am not exactly [sic] in my own mind as to when she sat down there. SheListening to her testimony, she said she got on ... or sat down there around the Lockhart hotbox detector, which would be east of Denham Springs and just west of the derailment site, but me personally, I don't remember exactly when she sat down.
....
Q. Did you permit Jan Byrd to operate the train that night?
A. Not to operate, no sir.
Q. What did you let her do?
A. She was standing or ... either squatting down or standing up by me the entire, you know, the whole time, and talking and just watching me run and somewhere in the course of right before we got to Livingston, because I know she hadn't been sitting there but just a little while, I asked her if she wanted to sit down and blow the whistle for me, because we had gone through, or over anything I had to put the brake on until I got to Hammond and I knew I would have to slow up for Hammond. I asked her if she wanted to sit down and blow the whistle and she said yes and she had been in the seat approximately five minutesI think is what she said too, about five minutes whenever it went into emergency.
In his statement of October 14, 1982, Robertson stated:
Heintze Did you not think it was irresponsible of you for her to be sitting in the seat?
Robertson Not with me standing there, I didn't. Like I said, it wasn't anything out of the ordinary, the speed, in my best estimate excessive, basically what she was doing was sitting there blowing the whistle at crossings, as far as operating the train, and any other thing that would have had to been done, I wouldn't have let her done that.
According to both statements, Byrd was in the engineer's seat at the time of the derailment and Robertson was standing next to her.
Regarding the speed of the train at the time of the derailment, Robertson testified at trial, as follows:
Q. Did you ever tell anybody that Well, you told him 25? Is that what you really thought it was going then, 25 at the time of the derailment or did you think it was going 43 or 40?
A. No, I wouldn't have given you a mile much over 35.

*772 Q. Did you know how fast it was going at the time of the derailment?
A. No, I didn't ... not an accurate account of it, no, I didn't.
Q. Were you watching the speedometer when it derailed?
A. I was watching it, but that's all you could do. It was fluctuating.
Q. What was it saying at the time it derailed?
A. Oh, somewhere between zero and 60.
Q. Between zero and 60?
A. That's right.
Q. It was fluctuating between zero and 60?
A. On occasion, yes sir.
In his prior statement, when asked the highest speed at which the train had been run that night, Robertson stated the following:
I'm being perfectly, you can believe I am being perfectly honest with you, uh, to the best of my knowledge, I would say not over 40, I really would, the way the speed recorder was going and like the way the train was handling and I wasn't impressed with the way it was handling.
Later, Robertson was asked about the speed of the train at the time of the derailment:
Robertson Well, I'm not trying, like I said, everything is all screwed up anyhow, I'm not trying to make it any lighter, but I would say not over 40, I really would.
Heintze But you really don't know?
Robertson I really, no, I would say not, uh, in the vicinity of 40, coulda been 38, coulda been 42, I would say around 40, I don't know what they, I've heard so many different figures that they have come up with, you know, I would say not over 40, my best guesstimate and that's all it would be, is pure speculative right now.
In both statements, Robertson indicated that the speedometer was fluctuating, that he really was not exactly sure of the speed of the train at the time of the derailment but that it was in the vicinity of 35 or 40 miles per hour.
Concerning the consumption of alcoholic beverages, in both statements Robertson admitted he had a few drinks at the hotel before he was aware that he might "aggregate out and list early." At trial, Robertson testified what was consumed on the train "did not constitute any alcohol at all." In his prior statement, Robertson stated the following:
Melander While you were on the train running from Baton Rouge towards Livingston, did yall pass potato chips and peanuts and all that kind of stuff. Mix up some drinks?
Robertson Yeah, we had the 7-Up and all that stuff still on there.
Robertson did not say that he consumed alcoholic beverages on the train. Even if his prior statement could be read to imply that he had consumed alcoholic beverages on the train, Robertson indicated in both statements that on the night of the derailment he was not intoxicated.
Since defendant's testimony at trial is free of any constitutional taint and of equal cast with his prior inculpatory statement, we find admission of his statements (even if improper) was harmless error beyond a reasonable doubt. La.C.Cr.P. art. 921; State v. Ferdinand, 441 So.2d 1272 (La. App. 1st Cir.1983), writ denied, 445 So.2d 1233 (La.1984); Mathew v. State, 209 So.2d 234 (Fla.App.1968); cf. State v. Sullivan, 277 S.C. 35, 282 S.E.2d 838 (1981); State v. Romero, 86 N.M. 674, 526 P.2d 816 (1974).
This assignment of error is without merit.

DECREE
For the foregoing reasons, the conviction and sentence are affirmed.
AFFIRMED.
NOTES
[*] Cole, J., dissents from denial of rehearing.
[1] The defendant does not contest the method used to select either the general or the petit jury venires. La.C.Cr.P. arts. 408 and 417; State v. Jacko, 444 So.2d 1185 (La.1984).
[2] La.R.S. 32:1514(B) provided as follows prior to its amendment by Acts 333 and 826 of 1984:

Any person who willfully violates any provision of this Chapter shall, upon conviction, be guilty of a felony and be fined not less than five thousand dollars nor more than ten thousand dollars, or be imprisoned with or without hard labor for not less than five years nor more than ten years, or both.
[3] Prior to this, defendant had been interviewed by the National Transportation Safety Board and his employer. The substance of these interviews is not in the record.
[4] The defendant also signed a written Miranda warning and executed a written waiver of rights at that time (12:22 p.m.).