DUFRESNE, Judge.
This is a juvenile proceeding. Five petitions were filed in the Jefferson Parish Juvenile Court seeking to have J.P., a sixteen year old juvenile, adjudicated a delinquent. One of the petitions was based on the allegation that J.P. committed simple burglary of a vehicle, in violation of LSA-R.S. 14:62. The other four petitions were *943 based on allegations that J.P. committed simple burglary of four different residences, with the intent to commit thefts therein, in violation of LSA-R.S. 14:62.2. On February 8,1989, J.P. denied the allegations contained in the petitions.
A motion to suppress the confession given to the police by the juvenile was filed by the juvenile’s attorney. This motion was based on the allegation that the statement was inadmissible because the minor child was interrogated before having actually consulted with a significant adult in violation of the requirements of State in the Interest of Dino, 359 So.2d 586 (La.1978), cert. denied, Louisiana v. Dino, 439 U.S. 1047, 99 S.Ct. 722, 58 L.Ed.2d 706 (1978). After a hearing, the juvenile court judge, denied the motion to suppress.
Subsequent to this ruling, the juvenile reserved his right to appeal then withdrew his former denials and entered admissions to three of the charges. The remaining two petitions were dismissed by the state. At the dispositional hearing, he was sentenced to the Department of Corrections for a period of two years on each count to run concurrently. The sentence was suspended and J.P. was placed on active probation for two years.
He now appeals the trial judge’s denial of his motion to suppress and urges four assignments of error:
1. During the initial interrogation, the officer did not afford the minor child a meaningful consultation with a significant adult.
2. The requirement of a meaningful consultation implies a private consultation.
3. During the initial interrogation, the officer obtained an admission of guilt by threatening the child with immediate imprisonment if he did not confess.
4. Subsequent admissions by the child at the police station during the ensuing days were the direct result of the initial, illegal interrogation. All confessions must be suppressed.
FACTS
According to the probation officer’s report to the court, J.P. was arrested and charged with the burglaries after he gave a taped statement to the police admitting his participation in the offenses.
Since the basis for this appeal is the denial of the motion to suppress, the following summary discusses the circumstances surrounding the juvenile’s statement as elicited at the suppression hearing.
Detective Dennis Dunn testified that he originally came into contact with J.P. on January 28, 1989, as he was a suspect in burglaries that occurred in Gretna. On that day, detective Dunn went to the juvenile’s residence and advised his grandfather, Michael Blanchard, that J.P. was a suspect in some burglaries and requested that he bring his grandson to the Gretna Police Department for questioning. The grandfather complied with this request and drove J.P. to the police department. When they arrived at the office, Detective Dunn filled out a rights form advising the juvenile that he was under investigation for simple burglary. The officer claims to have read all of the information contained on the rights form to the juvenile in the presence of his grandfather, whose name was placed as a witness on the bottom of the form. After indicating that he understood his rights, J.P. signed the form, expressing his desire to waive his constitutional rights and to make a statement about his knowledge of the commission of the crimes. J.P.’s grandfather also indicated that he understood the juvenile’s constitutional rights. Further testimony by Detective Dunn revealed that he gave J.P. and his grandfather an opportunity to discuss the matter privately so they could make a decision as to what they wanted to do. In fact, the two drove to the police department alone, unaccompanied by an officer. After the detective read J.P. his rights and afforded him an opportunity to speak with his grandfather, the juvenile gave a taped statement, to which the grandfather had no objection, admitting his participation in the burglaries. Detective Dunn testified that neither he nor anyone *944 in his presence promised J.P. anything, threatened him, or beat him in order to obtain the statement. Additionally, J.P.’s grandfather was present during his entire interaction with the detective.
When the detective attempted to have this statement transcribed, it was discovered that there was a malfunction in the recorder resulting in a portion of the statement being lost. Because of this malfunction, on Monday, January 30, 1989, the detective went to J.P.’s house and spoke to the grandparents informing them of the malfunction and requesting permission to obtain a second statement. The grandparents agreed to this request and further agreed to be present at the police station for the taking of the second statement. Prior to the second statement, the detective filled out five separate rights forms, one for each of the alleged offenses, and also advised J.P. that he was under arrest for simple burglary. After the detective read J.P. each of the five rights forms, the juvenile signed each form indicating that he understood his rights, and wished to waive them. The juvenile then gave a second taped statement. Both of the grandparents were present during the reading of the rights form and also during the taping of the statement.
Detective Dunn testified that he in no way threatened or coerced J.P. into giving this second statement, but rather that J.P. voluntarily gave the statement. Further, he in no way threatened the grandparents nor indicated to J.P. that his grandparents or mother could get in trouble if he did not give a statement. In addition to the whole weekend, J.P. was given an opportunity on Monday, January 30,1989, prior to giving a statement, to discuss the matter with his grandparents and mother. Neither J.P. nor his grandparents indicated that they wanted anyone else present, such as an attorney or J.P.’s mother, prior to the statement.
The recorder again malfunctioned, and this second statement was unable to be fully transcribed. After discovering the malfunction, Detective Dunn finished filling out the field arrest report, brought J.P. to get fingerprinted, and then brought him back to his house. Once there, Dunn told J.P.’s grandparents of the malfunction and requested that he be allowed to take a third statement, to which they agreed. Prior to taking this third statement at the house, the detective reread to the juvenile and his grandparents the rights forms that he had filled out and read to them earlier that day.
The testimony of the grandparents was somewhat different than that of Detective Dunn. Mrs. Hilda Blanchard, J.P.’s grandmother, testified that she was present when Detective Dunn first came to their home on Saturday, January 28, 1989. When he arrived, he started accusing J.P. of the thefts based on information that another juvenile in the neighborhood had given him. Allegedly Detective Dunn threatened to take J.P. to jail if he did not tell what had happened. Mrs. Blanchard testified that J.P. answered the questions that the detective asked and admitted criminal liability, but only after the grandparents urged him to tell the truth. Mrs. Blanchard claims that J.P. did not consult with them privately either before or after the questions were asked. According to Mrs. Blanchard, the detective actually took J.P. to the police department on January 28, 1989. She was of the further belief that the detective did not advise J.P. of any of his rights. During her testimony, the grandmother claimed that she did not exactly know the criminal consequences before urging J.P. to tell the truth. She further told the detective that although she did not have any objections to what J.P. was saying, his mother might have some objections.
On cross-examination, Mrs. Blanchard admitted that she and her husband were present in the room when the detective was talking to J.P. and although they were not consulting with J.P., they were talking to him. Further, they never urged J.P. not to say anything but rather advised him to talk to the detective and to tell the truth. When she urged J.P. to tell the truth, she did not think he was involved in the criminal activity, however, when he began to implicate himself, she did not advise him to stop talking. Mrs. Blanchard also admitted *945 that at no time did J.P. indicate that he did not want to talk to the detective or that he wanted a lawyer. Neither did the grandmother advise J.P. to get a lawyer even though she knew that he had a right to one.
Cross-examination of Mrs. Blanchard further revealed that on Monday, January 30, 1989, she was present and heard the officer read the rights forms to J.P. She further admitted that the family talked about the incident during the weekend because that was the only thing on their minds, and in fact, this matter was the primary topic of conversation from Saturday afternoon until Monday morning as they knew Detective Dunn would be back on Monday. She also testified that when the detective came to get J.P. on January 30, 1989, she again urged him to tell the truth. At no time during any of the three interviews did she advise her grandson not to talk to the detective, and at no time did J.P. indicate that he did not want to talk to the detective.
Mr. Michael Blanchard, J.P.’s grandfather, was also called as a witness. He was present when Detective Dunn came to their house on Saturday, January 28, 1989. According to Mr. Blanchard, Detective Dunn came into the house, and started asking J.P. questions about .robberies in the neighborhood. At first, J.P. did not say anything, but when the detective told J.P. that “it would be bad on him if he did not talk” and further threatened to take him to jail, J.P. started talking and indicated that he was involved in the offenses. In accord with his wife’s testimony, Mr. Blanchard claims that they did not have a chance to consult with their grandson privately before he started talking; however, they were present when Detective Dunn talked to J.P.
On cross-examination, Mr. Blanchard admitted that the detective explained to him why he was there and why he wanted to talk to J.P. He further admitted that he told J.P. that it would probably be best to talk and that he ought to tell the truth. When J.P. decided that he was going to talk, the detective read him his rights. In contradiction of his wife’s testimony, Mr. Blanchard claims not to remember whether he talked to J.P. about this matter over the weekend. He further admitted that when they went to the station on Monday, January 30, 1989 to give a second statement, Detective Dunn read all five of the rights forms to J.P. At this time, he again urged J.P. to tell, the truth. Prior to the third statement the detective again read J.P. his rights.
After listening to the testimony summarized above, the juvenile judge denied the motion to suppress, finding that the Dino requirements had been satisfied.
ASSIGNMENT OF ERROR NUMBER ONE
During the initial interrogation, the officer did not afford the minor child a meaningful consultation with a significant adult.
In his .brief, the minor child, through his attorney, claims that he .was denied his right to a meaningful consultation with a significant adult before making his confession. Therefore, based on this lack of meaningful consultation the minor child did not knowingly and intelligently waive his constitutional privilege against self-incrimination.
When a person is arrested or detained in connection with the investigation or commission of any offense, he must be fully advised of the reasons for his arrest or detention, of his right to remain silent, of his right against self-incrimination, of his right to assistance of counsel, and if indigent, of his right to a court appointed counsel. La. Constitution of 1974, Article 1, Sections 9, 11.
Before a confession can be introduced into evidence, the state has the burden of affirmatively proving that it was freely and voluntarily given and not made under the influence of fear, duress, menaces, threats, inducements or promises. L.R.S. 15:451. The state must also prove that a confession made during custodial interrogation was obtained only after the accused had been advised of his constitutional rights under Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) and had intelligently and voluntarily waived those rights. *946 State v. Toups, 499 So.2d 1149 (La.App. 5th Cir.1986), writ denied, 501 So.2d 772 (La.1987).
The constitutional privilege against self-incrimination and the rights to counsel and to confront and cross-examine witnesses are applicable in the case of juveniles as they are with respect to adult accuseds. In re Gault, 387 U.S. 1, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967). In State in Interest of Dino, supra, the Louisiana Supreme Court established a test to determine whether a juvenile knowingly and intelligently waived his constitutional rights. The Louisiana Supreme Court stated:
Because most juveniles are not mature enough to understand their rights and are not competent to exercise them, the concepts of fundamental fairness embodied in the Declaration of Rights of our constitution require that juveniles not be permitted to waive constitutional rights on their own. For these reasons we hold that in order for the state to meet its heavy burden of demonstrating that a waiver is made knowingly and intelligently, it must affirmatively show that the juvenile engaged in a meaningful consultation with an attorney or an informed parent, guardian, or other adult interested in his welfare before he waived his right to counsel and privilege against self-incrimination.
Accordingly the purported waiver by a juvenile must be adjudged ineffective upon the failure by the state to establish any of three prerequisites to waiver, viz., that the juvenile actually consulted with an attorney or an adult before waiver, that the attorney or adult consulted was interested in the welfare of the juvenile, or that, if an adult other than an attorney was consulted, the adult was fully advised of the rights of the juvenile. In the instant case the record establishes that Andrew Dino’s mother, who was interested in his welfare, was present at the police station during the interrogation. However, the state did not show that Mrs. Dino was fully advised of her juvenile son’s rights or that Andrew actually consulted with her in waiving his rights. We are therefore constrained to conclude that the statement should have been suppressed, [footnotes omitted]
In the present case, we hold that the Dino requirements were satisfied: 1) The testimony produced by the state has sufficiently shown that the juvenile engaged in a meaningful consultation with an informed adult. At the hearing on the motion to suppress Detective Dunn testified that he gave the juvenile and his grandfather an opportunity to discuss the matter privately so that they could make a decision as to what they wanted to do. In fact, the two of them drove alone to the police department on Saturday, January 29, 1989, giving them an opportunity to discuss the matter. The detective also testified that after he read J.P. his rights in the presence of his grandfather he again afforded him an opportunity to speak with his grandfather, prior to taking the first statement on January 28,1989. In addition to the whole weekend, he afforded the juvenile an opportunity to consult with his grandparents prior to taking the second statement of Monday, January 30, 1989. In addition to the detective’s testimony, the grandmother indicated that they talked about the matter for the majority of the weekend as it was foremost on their minds. The detective had also told both the grandparents and J.P. to discuss the matter over the weekend because it was a serious matter. 2) It can also be said that the adults consulted were interested in the juvenile’s welfare. In State v. Brand, 475 So.2d 29 (La.App. 4th Cir.1985), writ denied, 480 So.2d 739 (La.1986) the juvenile consulted with his father before giving a statement. The court noted, “We may presume that from the filial relationship itself there is an interest of a father in his son’s welfare.” In State v. Belton, 525 So.2d 77 (La.App. 3rd Cir.1988), it was held that appointment of probation officer to act as a “concerned adult” during questioning of a juvenile because his mother was in prison and his father’s whereabouts were unknown was inadequate to comply with the Dino requirements. 3) The state also established that at least one of J.P.’s grandparents was present during the three interviews that *947 Dunn conducted with the juvenile. It was also shown that the grandparents and J.P. were advised of the juvenile’s rights prior to the taking of each of the statements, and after being fully advised of these rights, the grandparents urged J.P. to tell the truth.
Despite some conflicting testimony as to whether or not the grandparents were given the opportunity to and actually did consult with J.P. the trial judge chose to give more weight to Detective Dunn’s testimony. The trier of fact is the determiner of the credibility of the witnesses. State v. Amaud, 412 So.2d 1013 (La.1982). His decision is entitled to great weight and will not be disturbed unless clearly contrary to the evidence. State v. Toups, supra.
It cannot be said that the trial judge’s decision was clearly contrary to the evidence. As it appears that a meaningful consultation took place in accordance with the requirements of State in Interest of Dino, supra, this assignment is without merit.
ASSIGNMENT OF ERROR NUMBER TWO
The requirement of a meaningful consultation implies a private consultation.
In Dino, the Louisiana Supreme Court established the requirement of a “meaningful” consultation. However, the court did not specify whether the consultation had to be in private in order to fit the definition of “meaningful”.
It appears that the circuits differ on their views as to what constitutes a “meaningful consultation”. In State in Interest of Francois, 411 So.2d 588 (La.App. 1st Cir.1982) the juvenile’s mother was present with her son when he was informed of his right to remain silent and to the assistance of counsel and was present during the questioning of her son. Although the testimony at the motion to suppress hearing revealed that the juvenile and his mother understood the constitutional rights, the evidence revealed that the juvenile did not actually consult with nor discuss with his mother whether these rights should be waived and whether he should make a statement to the officers. In the Francois case, neither the juvenile nor his mother were advised that they had the right to actually consult with each other and discuss in private whether these rights should be waived and a statement given. The evidence further showed that no opportunity for consultation or discussion was afforded to the juvenile and his mother prior to his waiver of rights and questioning.
In the more recent case of State v. Johnson, 508 So.2d 953 (La.App. 4th Cir.1987) the Fourth Circuit expressly refused to follow the First Circuit’s decision in Francois. In Johnson, the Fourth Circuit concluded that the juvenile knowingly and intelligently waived his rights where his mother was present during the time that juvenile was in custody. In addition, both the juvenile and his mother were twice advised of juvenile’s rights and both parties were allowed and did ask questions concerning the rights of the juvenile. The juvenile and his mother were given a written recitation of the rights, which recitation was read, and signed by both parties. Prior to the taped question and answer session in which the juvenile and his mother agreed to waive the juvenile’s rights, the pair was.given a period of approximately ten minutes in which they could have engaged in a meaningful consultation. In finding that the Dino requirements were satisfied, the Fourth Circuit stated:
We disagree with and refuse to follow the decision by the First Circuit in State v. Francois, 411 So.2d 588 (La.App. 1st Cir.1982). In interpreting Dino, supra, the court in Francois, found that the juvenile and his attorney and/or informed adult had to be afforded an opportunity for a “private” consultation. Dino, supra, in our opinion, does not go that far. We interpret Dino as requiring an opportunity for a “meaningful” consultation, be that consultation public or private.
In the present case, the juvenile and his grandparents were given the opportunity for both a private and “public” consultation. The testimony adduced at the hearing indicates that prior to taking the first statement, the detective gave J.P. an oppor *948 tunity to consult privately with his grandfather. In fact, the two had the opportunity to discuss the matter privately as they were riding to the police station. Prior to taking a subsequent statement on January 30, 1989, the detective testified that he again gave J.P. an opportunity to consult with his grandparents. In addition, the grandmother testified that they discussed the matter the majority of the weekend.
Furthermore, both the grandparents and J.P. indicated that they understood the constitutional rights involved. After the grandparents were advised of the constitutional rights and indicated that they understood them, they still urged J.P. to tell the truth. Despite the conflicts in testimony as to whether J.P. was given an opportunity to privately consult with his grandparents, the evidence amply supports a finding that J.P. and his grandparents, being interested and informed adults, were given the opportunity and actually did engage in a “meaningful” consultation, as per the Dino requirements.
This assignment is without merit.
ASSIGNMENT OF ERROR NUMBER THREE
During the initial interrogation, the officer obtained an admission of guilt by threatening the child with immediate imprisonment if he did not confess.
In this assignment, appellant argues that because of threats made to the child, the initial interrogation was illegal whether or not this court finds that a meaningful consultation took place. At the suppression hearing, Detective Dunn testified that neither he nor anyone in his presence, at any time, used force, or made promises or threats in order to obtain the statement from the juvenile. On the other hand, Mr. and Mrs. Blanchard testified that threats of imprisonment were made to the juvenile.
Faced with a credibility call, the trial judge chose to believe the testimony of Detective Dunn. The conclusions of a trial judge on the credibility and weight of the testimony relating to the voluntariness of a confession will not be overturned unless they are not supported by the evidence. State v. Jones, 386 So.2d 1363 (La.1980), State v. Toups, supra. In addition to establishing that the juvenile and his grandparents were fully advised of their constitutional rights, the testimony in the present case establishes that the confession was freely and voluntarily given and not made under the influence of fear, duress, coercion, threats, inducements or promises.
Accordingly, this assignment is without merit.
ASSIGNMENT OF ERROR NUMBER FOUR
Subsequent admissions by the child at the police station during the ensuing days were the direct result of the initial, illegal interrogation. All confessions must be suppressed.
In his final assignment, the child’s attorney argues that the officer used threats to obtain a statement and evaded the requirements of Dino when he first went to the juvenile’s house. He alleges, therefore, that because this initial interrogation was illegal, all subsequently recorded statements must be suppressed.
As set forth in the first three assignments of error, the evidence in the present case supports the conclusion that the officer fully complied with all constitutional requirements throughout his interaction with the juvenile. The detective afforded J.P. all of his constitutional privileges, fully advised J.P. and his grandparents of the juvenile’s rights and also followed the requirements of Dino. Based on the testimony, it cannot be said that there was any illegality during the initial interrogation. Accordingly, this assignment has no merit.
DECREE
For the foregoing reasons, the Motion to Suppress was properly denied by the trial court.
Accordingly, the conviction and disposition herein are affirmed.
AFFIRMED.