389 So.2d 1307 (1980)
STATE of Louisiana
v.
Everett Blaise CASTILLO.
No. 66696.
Supreme Court of Louisiana.
October 6, 1980.
Rehearing Denied November 21, 1980.
*1308 William J. Guste, Jr., Atty. Gen., Barbara Rutledge, Asst. Atty. Gen., Knowles M. Tucker, Dist. Atty., Dracos D. Burke, Asst. Dist. Atty., for plaintiff-appellee.
Dymond, Crull & Castaing, Edward J. Castaing, Jr., New Orleans, for defendant-appellant.
MARCUS, Justice.
Everett Blaise Castillo was indicted by the grand jury for the crime of aggravated rape in violation of La.R.S. 14:42. After trial by jury, defendant was found guilty of attempted aggravated rape and sentenced to serve thirty years at hard labor. On appeal, defendant assigned twenty assignments of error for reversal of his conviction and sentence.[1]

ASSIGNMENTS OF ERROR NOS. 1, 7 AND 8
Defendant contends the trial judge erred in allowing in evidence an oral inculpatory statement made by him while in police custody. He argues that the statement was not freely and voluntarily made after having been advised of his Miranda rights.
Defendant's pretrial motion to suppress all written inculpatory statements and a pistol obtained as a result of a written confession was held on December 4, 1978, before Judge Robert M. Fleming. All officers involved in the arrest and interrogation procedures testified as to the facts surrounding defendant's oral inculpatory statement made in the patrol car at the parking lot and his subsequent written confession given at the police station. Defendant also testified at the suppression hearing. At the conclusion of the hearing, Judge Fleming ruled as follows:
[T]he defendant moved to suppress a confession given to two detectives, and also a gun that was found in the police car. And I do not recall whether there was a motion to suppress the statement that was made to Officer Viator, or not. However, all motions are denied.
Defendant objected to the ruling. The prosecutor then asked the court:
[D]oes that mean, then, that the statement made by the accused to Officer Viator in the parking lot is considered voluntary?
Judge Fleming answered in the affirmative. Defense counsel clearly heard that the judge's ruling applied to both the oral and written confessions. Nonetheless, he made no objection to the inclusion of the ruling on the oral statement. On January 23, 1979 (over a month and a half after the suppression hearing), the state served notice on the defense that it intended to use both the oral and written inculpatory statements at trial. However, the state later chose not to introduce the written confession or pistol in evidence at trial.
Trial commenced on February 12, 1979, and was presided over by Judge Robert E. Johnson. Defendant had not reurged a motion to suppress the oral inculpatory statement prior to trial. During Officer Viator's testimony, while the jury was retired to allow the judge to rule on a hearsay objection, the prosecutor informed the judge that Viator's testimony would include a statement which was "in effect a spontaneous confession" and thus an exception to the hearsay rule. Defendant's objection was overruled and the jury was returned to the courtroom. After Officer Viator testified *1309 as to the oral statement made by defendant, defense counsel raised several objections, inter alia, that the state had not laid a proper foundation for admission of the inculpatory statement in evidence. After the jury was retired, defense counsel argued that the state had failed to meet its burden of proving that defendant's inculpatory statement was free and voluntary after having been advised of his Miranda rights. The state responded that a ruling on the admissibility of the oral inculpatory statement had been made following the pretrial suppression hearing. The trial judge then overruled the objection "for the same reasons as given by Judge Fleming" and admitted the oral statement in evidence.
Defendant first contends that he was erroneously deprived of his right to a hearing, outside the presence of the jury, on the issue of the voluntariness of the oral inculpatory statement before it was introduced in evidence. This contention is without merit because the voluntariness of the oral statement was established at the pretrial suppression hearing. Although defendant did not seek to suppress the oral statement at that hearing, he clearly heard the court rule that the oral statement was considered voluntary. He made no objection to the court's expansion of the suppression hearing beyond the pleadings to include a ruling on the voluntariness of the oral statement. Moreover, at no time prior to trial (some two months later) did defendant attempt to reurge the motion to suppress the oral statement. At trial, defendant objected on a number of grounds, including the state's failure to lay a proper foundation, but did not seek a hearing outside the presence of the jury on the question of voluntariness. Hence, we conclude that the prior ruling on admissibility of the oral inculpatory statement was properly accepted by Judge Johnson at the trial on the merits. However, this did not prevent defendant from introducing evidence during trial concerning the circumstances surrounding the making of the inculpatory statement for the purpose of enabling the jury to determine the weight to be given to it. La.Code Crim.P. art. 703(B).
Next, we proceed to the merits of defendant's complaint, i.e., whether the trial judge erred in allowing in evidence an oral inculpatory statement made by him while in police custody. He argues that the statement was not freely and voluntarily made after having been advised of his Miranda rights.
The facts developed at the suppression hearing are as follows. During the early morning hours of July 2, 1978, Officer Emery of the New Iberia City Police Department was on patrol when he received a radio broadcast advising him that there had been a kidnapping at the Pizza Hut in the Torrido Village Mall. The call also gave a description of defendant. Subsequently, Officer Emery received a call from Officer Blanchard, who notified him that the suspect was in the general area of the Iberia Parish Hospital. Blanchard had followed defendant, who was in the victim's car, from a nearby cane field to the hospital, at which time defendant jumped out of the car and escaped.
Shortly thereafter, defendant was apprehended by Officer Emery. Another policeman, Sergeant David, arrived on the scene as defendant was handcuffed, informed that he was under arrest and placed in the back seat of Officer Emery's police car. As defendant was being driven to the police station, Officer Emery received a call requesting that he take defendant to the Torrido Village Mall parking lot so that defendant's car keys could be used to move an automobile suspected of belonging to defendant. Upon arriving at the parking lot, Officer Emery was met by Officers Mestayer and Viator, who had been watching the suspect's car, and by Sergeant David. The four policemen conversed briefly, and when Officers Mestayer and Viator began heading towards the patrol car in which defendant was handcuffed, defendant shouted racial slurs and obscenities at the policemen. Officer Mestayer then opened the rear door of the car and asked defendant where his car keys were located. According to Officer Viator's testimony, defendant replied, "if you want the mother fuckers . . . come get them yourself" *1310 and "you all going to beat me anyway, cause I raped the white bitch."[2] Officer Mestayer testified that he searched defendant's pockets, found the car keys, closed the car door and told Officer Emery to take defendant to the police station. He further testified that, during this brief encounter in the car, he became angry, lost his cool and slapped defendant; however, he stated that the incident occurred after he had secured the keys from defendant.[3]
At the police station, defendant was given his Miranda warnings for the first time. He declined to make a statement or contact an attorney. Afterwards, he was locked up in a drunk tank where Officer LeBlanc sprayed him with mace. Approximately one hour later, defendant was brought by Officer Feller to Lieutenant Judice's office, where he was allowed to wash off the residue left by the mace. Lieutenant Judice advised defendant that, if the victim's statement that defendant had raped her on the hood of her car was correct, then defendant's fingerprints would be on the car. Defendant then gave a written confession wherein he stated that the pistol he used in the crime was located beneath the back seat of the patrol car that brought him to the station. The pistol was later recovered from that location.
Before a confession can be introduced in evidence, the state has the burden of affirmatively proving that it was free and voluntary and not made under the influence of fear, duress, intimidation, menaces, threats, inducements or promises. La. Code Crim.P. art. 703(C); La.R.S. 15:451. The admissibility of a confession is in the first instance a question for the presiding judge. His conclusions on the credibility and weight of the testimony relating to the voluntariness of a confession will not be overturned unless they are not supported by the evidence. State v. Jones, 386 So.2d 1363 (La.1980); State v. Hutto, 349 So.2d 318 (La.1977). In the instant case, Judge Fleming ruled that defendant's statement made in the patrol car at the parking lot was voluntary. After reading the record of the suppression hearing, we are convinced that this conclusion is supported by the evidence.
It must also be established that an accused who makes a confession during custodial interrogation was first advised of his Miranda rights. Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). In Miranda, the United States Supreme Court observed: "By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been deprived of his freedom of action in any significant way." Spontaneous and voluntary statements, not given as a result of police interrogation or compelling influence, are admissible in evidence without Miranda warnings even where a defendant is in custody. State v. Jones, supra; State v. Robinson, 384 So.2d 332 (La.1980); State v. George, 371 So.2d 762 (La.1979); State v. Thornton, 351 So.2d 480 (La.1977); State v. Sockwell, 337 So.2d 451 (La.1976); State v. Thomas, 310 So.2d 517 (La.1975); State v. Higginbotham, 261 La. 983, 261 So.2d 638 (1972); State v. Hall, 257 La. 253, 242 So.2d 239 (1970). The United States Supreme Court recently defined the term "interrogation" in Rhode Island v. Innis, ___ U.S. ___, ___, 100 S.Ct. 1682, 1689, 64 L.Ed.2d 297 (1980):
We conclude that the Miranda safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent. That is to say, the term "interrogation" under Miranda refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect. The *1311 latter portion of this definition focuses primarily upon the perceptions of the suspect, rather than the intent of the police.... A practice that the police should know is reasonably likely to evoke an incriminating response from a suspect thus amounts to interrogation. But, since the police surely cannot be held accountable for the unforeseeable results of their words or actions, the definition can extend only to words or actions on the part of police officers that they should have known were reasonably likely to elicit an incriminating response. [Footnotes omitted.]
In the instant case, defendant made his inculpatory statement while in police custody and prior to being advised of his Miranda rights. However, we conclude that his statement was given spontaneously and voluntarily and was not a result of police interrogation. After defendant's arrest, he was driven to the Torrido Village Mall parking lot so that officers there could obtain his keys to move his car. As Officers Mestayer and Viator approached defendant, he shouted racial slurs and obscenities at the policemen. Defendant was asked no questions about the kidnapping or rape-he was only questioned regarding the location of his car keys. It was at this time that defendant said "you all going to beat me anyway, cause I raped the white bitch." Officer Mestayer's request for the location of defendant's car keys could not have reasonably been expected to elicit an incriminating response from defendant. Because the inculpatory statement was an unforeseeable result of police conduct rather than the product of police "interrogation" as defined in Innis, the oral inculpatory statement was properly ruled admissible.
Having reviewed the remaining assignments of error asserted by defendant, we find that they present no reversible error and do not require published explanation because they do not present any question of unsettled law. Therefore, these assignments of error are discussed in an unpublished but publicly-recorded appendix to this opinion.

DECREE
Defendant's conviction and sentence are affirmed.
DIXON, C. J., dissents with reasons.
CALOGERO, J., dissents, would remand to trial court for hearing on whether oral inculpatory statement was inadmissible.
DIXON, Chief Justice (dissenting).
I respectfully dissent.
Assignments of Error Nos. 1, 7 and 8 deal with rulings on the voluntariness and admissibility of an oral inculpatory statement in which Castillo allegedly told the police that they "were going to beat him anyway, cause he raped a white bitch." In order to address these issues, it is necessary to place this statement in the substantive context of the events surrounding defendant's arrest and in the procedural context of pretrial proceedings and the trial itself.
The events which culminated in Castillo's capture began when two young women, the manager and an employee, locked up the Torrido Village Mall Pizza Hut early one morning and got into their cars in preparation for dropping the day's receipts at a night depository before going home. As the employee watched, an unknown black male gained entry to the manager's car and drove off with her. The employee quickly phoned police headquarters, where information about the incident was transmitted by the dispatcher. Officer Blanchard had just come off duty and was in the police station when the call came in. Because he was familiar with the kidnapped girl and her car and "just assumed the worst, that maybe she was going to be raped or possibly killed," Blanchard decided to look for the car in an area of cane fields not far from the scene of the abduction. On his way to that area he passed a police car and stopped to communicate his suspicions to its driver, Officer Emery.
Blanchard's hunch about location proved correct: he soon spotted the victim's car, being driven by the victim while a man crouched in the passenger seat, and he pursued it to a hospital parking lot, where the *1312 man jumped from the car and became lost in the darkness as he ran in an easterly direction. After talking briefly with the victim, Blanchard informed police headquarters that the Pizza Hut manager had been raped and he gave the police a general description of the suspect and the direction in which he had fled. Very soon after this information was broadcast, a man fitting the general description ran past Officer Emery, ignored the officer's command to stop, and was apprehended after a brief chase. Another police officer, Sergeant David, joined Emery as he handcuffed defendant and patted him down. Emery phoned headquarters with the information that he was on his way with the prisoner, but as he was driving toward the station, with Sergeant David's car following, he received a request that he stop at the Torrido Village Mall, where two other officers, Mestayer and Viator, had staked out the only car remaining in the parking lot because they suspected that it belonged to the kidnapper.
Mestayer was the officer who had responded to the call placed by the Pizza Hut employee at the time of the abduction, interviewing this eyewitness at the scene of the incident. At that time he had been accompanied by Officer LeBlanc, whose wife worked with the victim as assistant manager of the Pizza Hut; in fact, Mrs. LeBlanc would have been on duty that night if the victim had not taken her place. Officer Mestayer placed the lone car parked at the scene under surveillance, and when he and Officer Viator heard Emery's announcement that he had a suspect in custody they radioed to him requesting that he stop in the parking lot so that they could get the suspect's car keys and unlock the car's steering column for towing.
After the cars driven by Officer Emery and Sergeant David arrived at the parking lot, the four policemen conferred while Castillo remained in the back seat of Emery's car, hands cuffed behind his back. According to Mestayer's testimony at the hearing on the motion to suppress, Castillo addressed the officers with racial epithets and refused to cooperate in producing the car keys. At that point, Mestayer admitted, "out of being mad I lost my cool and slapped him." Officer Viator, who was with Mestayer when he approached the car in which Castillo was sitting to try to obtain the keys, agreed that defendant was profane and non-cooperative. He described the context of defendant's inculpatory statement in the following terms:
"A. [When Mestayer] [w]ent into the car, and asked him which pocket his keys were in, he said, if you want the mother fuckers, to come get them yourself. He says, you all going to beat me anyway, cause I raped the white bitch.
Q. Now, you say Mestayer-where was Mestayer when this was being said?
A. Inside the-well, not inside the car, but by the front door of the car. You know he opened the back door of the car, and he was standing there."
According to Viator, defendant made his statement before there was any physical contact between him and Mestayer. After Mestayer slapped Castillo he searched his pockets, found the car keys, and transferred his attention to the suspect's car. Officer Emery re-entered the patrol car in which Castillo was sitting and completed the journey to the police station where-for the first time during this entire sequence-Castillo was informed of his Miranda rights.
After receiving the Miranda warnings Castillo declined to make a statement or to contact an attorney but he did make a phone call to his mother. He was then locked up in the drunk tank, where Officer LeBlanc located him shortly thereafter and sprayed him with mace. He gave a written confession within an hour or so after the macing, after the police permitted him to wash off the residue left by the gas and informed him that incriminating fingerprints were present on the hood of the victim's car and that he would be placed in a lineup. The written confession was not introduced at trial, nor was the pistol which was located as a result of that confession, but Castillo's oral statement, "you all going to beat me anyway, cause I raped the white bitch," was placed before the jury.
*1313 The critical issue presented by the facts is whether the state was under an obligation to safeguard defendant's privilege against compulsory self-incrimination by informing him of his rights under Miranda, at the time of his inculpatory statement. Resolution of this issue is complicated by the absence from the record of any conclusive evidence on this point, as the result of certain procedural errors. On October 4, 1978 defendant filed a pleading styled "Motion to Suppress Confession and Other Evidence" which sought to suppress "all written confessions or other written inculpatory statements obtained by Officers Judice and Feller," and, in addition, the gun located as a result of the written confession. On December 4, 1978 that motion was argued before Judge Fleming at a four hour hearing whose focus was-quite naturally, given the specific purpose of the motion to suppress-the voluntariness or not of the written confession, in the light of the physical abuses suffered by defendant before he made it. Because defendant had filed a federal complaint in connection with those abuses, a United States attorney was present at the hearing and an investigator for the Federal Bureau of Investigation appeared as a witness. Castillo himself took the stand and testified regarding the impact of the slapping incident and the macing on his state of mind at the time of the written confession, but he was not questioned about his oral statement nor about the events which preceded it. The testimony of the four police officers who had been present at the time of the oral statement touched upon that period of time in only the most superficial fashion, merely as part of the chain of events which led up to and explained the slapping incident. Neither the prosecutor nor counsel for the defense raised the issue of the voluntariness of the oral statement in his closing argument. Again, their concern was with the written confession. However, on the day following the hearing, Judge Fleming ruled on defendant's motion in the following terms:
"BY THE COURT: Yesterday we had a hearing on a motion to suppress certain matters in the case of State of Louisiana versus Everett Castillo, and I note that the defendant's in Court, with the District Attorney, and Mr. Porteus Burke, his lawyer. I want to rule on the motion to suppress. The State moved-rather, the defendant moved to suppress a confession given to two detectives, and also a gun that was found in the police car. And I do not recall whether there was a motion to suppress the statement that was made to Officer Viator, or not. However, all motions are denied.
BY MR. P. BURKE: To which ruling, your Honor, of course we object.
BY THE COURT: Yes sir. Your objection is noted.
BY MR. D. BURKE: Your Honor, does that mean, then, that the statement made by the accused to Officer Viator in the parking lot is considered voluntary?
BY THE COURT: Yes, sir."
This ruling was clearly wrong. Defendant had not moved to suppress the oral statement, neither the state nor the defense intended to address that issue, and there was no evidence on the basis of which the court could validly determine that the statement was admissible. But when the state, some six weeks later, filed a notice of its intent to use both the oral statement and the written confession at trial, there seems to have been no way in which defendant could reopen the question of the statement's admissibility.
The trial itself was presided over by Judge Johnson, who had not been present at the hearing and ruling on the motion to suppress. In the course of Officer Viator's testimony, while the jury was retired, the prosecutor informed the judge that the witness' testimony would include a statement which was "in effect a spontaneous confession." Defense counsel did not respond, but when the witness began to recount the oral inculpatory statement to the jury, counsel raised a hearsay objection and asked that the jury again be removed. The objection was overruled and after the statement had been put before the jury, counsel objected on several grounds, among them the state's failure to lay a foundation for admission of an inculpatory statement. Defense counsel *1314 argued this point rather extensively, noting the absence of any evidence that Miranda warnings had preceded the statement. In response, the state conceded that the statement was a confession and that the prosecution bore the burden of proving voluntariness; but it informed the judge that the statement had been found voluntary in the ruling on the motion to suppress, and it presented this prior ruling on the motion to suppress as one which obviated the necessity for making any further determination of voluntariness at trial. The judge's response was as follows:
"Well, the Court, of course, overrules the objection, and for the same reasons as given by Judge Fleming. The Court will overrule that objection. Would you like to talk on your other objections, Mr. Burke?"
Again, the ruling was wrong, first because it relied on an earlier ruling which itself was erroneous, second because even after a confession has been ruled admissible by the trial judge, the state is further required to establish the predicate of voluntariness before the jury. State v. McGraw, 366 So.2d 1278 (La.1979); C.Cr.P. 703(B).
In State v. Huizar, 332 So.2d 449, 452 (La.1976), we observed that "[spontaneous, volunteered statements given without coercion or custodial interrogation are not subject to exclusion because of non-compliance with Miranda's prior-warning requirements." Defendant was unquestionably in custody when he made his inculpatory remark, so that the crucial question is whether that statement was truly spontaneous and volunteered, as the state argues, or whether it was instead the result of police conduct which might be characterized as "interrogation." In Rhode Island v. Innis, ___ U.S. ___, ___, 100 S.Ct. 1682, 1689, 64 L.Ed.2d 297, 307-308 (1980), in the context of a somewhat similar fact situation, the United States Supreme Court defined "interrogation" in the following terms:
"We conclude that the Miranda safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent. That is to say, the term `interrogation' under Miranda refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect. The latter portion of this definition focuses primarily upon the perceptions of the suspect, rather than the intent of the police.. ..
[Id] By `incriminating response' we refer to any response-whether inculpatory or exculpatory-that the prosecution may seek to introduce at trial. . . ."
After Castillo had been apprehended and handcuffed by Officer Emery and patted down by Emery and Sergeant David, he spent "a couple of minutes" in the back seat of Emery's car en route to the Torrido Village parking lot. By that time it appears that Emery was aware of the identity of the victim and knew that she had been raped. While the two were in the car together, Emery received the radioed information that there was a car at the scene of the abduction which probably belonged to the perpetrator. He then engaged in an exchange of communications with his prisoner which was sufficient to convince him that the keys to that car were on Castillo's person, but we have no evidence about his words or actions during that period. After his arrival at the parking lot, we only know that Castillo was asked whether the car was his, whether he had the keys, and where they were, before he made his inculpatory statement. Again, there is no evidence concerning other words or actions on the part of the four police officers who were present at that time. Even on the basis of the few facts currently available, however, it seems quite possible that defendant's statement was made in response to police conduct which constituted interrogation, particularly in light of indications of a degree of personal animus against defendant on the part of some members of the police department, and taking into consideration the fact that Castillo was only seventeen years old at the time of his arrest. And even if Castillo's remarks were "clearly expressions of defiance and bravado," as the state *1315 claims in brief, expressions of defiance and bravado are not characteristic only of unsolicited, voluntary statements; the same bravado might characterize a reaction of hopelessness and helplessness in the face of compulsion.
Clearly, defendant was deprived of a determination of whether his oral inculpatory statement was inadmissible because it was made in response to custodial interrogation without prior Miranda warnings. The case should be remanded to the trial court for a hearing on this issue.
NOTES
[1] Defendant has expressly abandoned Assignments of Error Nos. 2, 4, 5, 9, 10, 11, 12, 13, 14, 15, 17, 18 and 19 in his brief to this court.
[2] Officer Viator testified concerning defendant's oral inculpatory statement. Officer Emery and Sergeant David were apparently out of earshot when it was made. Officer Mestayer's testimony was silent on this point.
[3] Officer Mestayer testified he slapped defendant once with an open hand, but defendant claimed he was punched twice with a closed fist. Officer Mestayer was suspended for two days for this misconduct.