635 So.2d 1177 (1994)
STATE of Louisiana
v.
Patricia VAN WINKLE.
No. 93-KA-843.
Court of Appeal of Louisiana, Fifth Circuit.
March 16, 1994.
*1179 John Mamoulides, Dist. Atty., Dorothy A. Pendergast, Asst. Dist. Atty., Gretna, for plaintiff-appellee.
Bruce G. Whittaker, Indigent Defender Bd., Gretna, for defendant-appellant.
Before GAUDIN, GRISBAUM and DUFRESNE, JJ.
DUFRESNE, Judge.
The defendant, Patricia Van Winkle, was indicted for the second degree murder of her twelve year old son, Patrick Van Winkle, LSA-R.S. 14:30.1. At arraignment she entered a plea of not guilty.
The trial judge denied defendant's motion to suppress a confession and to suppress evidence.
The defendant was tried before a twelve person jury and was found guilty of manslaughter, LSA-R.S. 14:31. She was sentenced to twenty-one years at hard labor, with credit for time served. Defense counsel moved for the court to reconsider the sentence, which was denied by the trial judge. Thereafter the defendant filed a motion for appeal.

FACTS
In July of 1991, defendant lived in Jefferson Parish at 572 Terry Parkway, Apartment D, with her son, Patrick Van Winkle, her daughter, Charlene Van Winkle, and a roommate, Darrell Hurst. The apartment was a two story dwelling, consisting of a den/living area and kitchen on the first floor and three bedrooms and a bathroom on the second floor. Hurst and Patrick each had his own individual bedroom while Charlene and defendant shared a bedroom.
On Friday night, July 12, 1991, defendant and Hurst were downstairs in the apartment watching television and drinking beer. At about 1:00 a.m. on July 13th, Patrick, who had been upstairs playing Nintendo, came downstairs and started telling them about an awful dream he had the night before. According to Hurst, Patrick had a dream that his mother had died and he had to give somebody $200.00 to bring her back to life. When she came back to life, she had a knife and tried to kill Patrick with it. As Patrick relayed the portion of the dream about the knife, Patricia, who was intoxicated, went into the kitchen, pulled out a knife from the drawer, stood about five feet from Patrick with the knife and told him "Yes, I'm the monster, I'm going to kill you, I'm going to get you." Defendant laughed and then went back into the kitchen; however, she seemed irritated after that point.
After this incident, Patrick asked his mother why was she drinking. Defendant yelled at him, telling him not to worry about it and that it was none of his business what she did. Hurst eventually went to sleep upstairs, leaving Patricia and Charlene downstairs. At approximately 3:00 or 4:00 a.m., Hurst heard a male voice, screaming, as if he was being hurt. He also heard a loud thumping noise, like someone was running in the next room. Additionally, he saw a light on, which he believed to be coming from Patrick's room. In response to these noises, Hurst woke up and looked out the window and door. When he did not see anything, he went back to sleep. Hurst testified that he did not investigate the incident any further because he figured that if the children were playing around, defendant would go in and make them go to bed.
Later as they were watching television, one of Patrick's friends came to the door *1180 asking if Patrick could play. Defendant went outside, talked to the boy, and then went upstairs. At that point, defendant yelled. Hurst went upstairs, observed that the covers were off of Patrick and also observed that it looked like he had been beaten up because he had blotches on his legs and cuts on his neck. When Hurst shook Patrick to wake him up, he saw that he was not breathing. Defendant ran to the telephone and called 911.
When Deputy Bruce Chauvet of the Jefferson Parish Sheriff's Office arrived at the apartment, he observed defendant and Hurst sitting in the den. When defendant noticed the officer, her calm demeanor changed and she began screaming that her son was not breathing and that she thought he might have committed suicide. Defendant then led Deputy Chauvet upstairs. Upon entering the room, the officer observed the boy lying face down and also observed that lividity had set in, thereby indicating that the child had been dead for several hours. He also noticed lacerations around the child's neck and what appeared to be blood spatters on the wall directly along the side of the bed. Deputy Chauvet escorted the defendant back downstairs and notified headquarters to send out the homicide division, the coroner's office and crime scene technicians.
When other police officers arrived, they began processing the crime scene, which included taking photographs inside the apartment and retrieval of certain evidence. During this time, defendant signed a consent to search form, giving the officers permission to search her apartment. She was very cooperative and told the officers to take anything they needed because she wanted to find out what had happened to her son. Among the items taken from the apartment, the police seized a knife found in the victim's bedroom and a pair of hiking boots, size "8", located in defendant's bedroom.
Even though the child's death was unclassified at this stage, defendant was transported to the detective bureau for questioning. She gave taped statements on July 13 and July 14, 1991. Subsequent to her July 14 statement and based on other information the police officers had obtained, Lieutenant Steve Buras directed that defendant be arrested for criminal neglect and cruelty to a juvenile. She was thus booked at the Jefferson Parish Correctional Center at noon on July 14, 1991. Over the next several days, the police continued their investigation by interviewing defendant and by searching her apartment two more times, once pursuant to her consent and another time pursuant to a search warrant obtained by Detective Reed Rushing. In addition to oral interviews, the police took two more taped statements from defendant. In an oral statement introduced at trial, defendant admitted that the killing was a manslaughter. In one of her taped statements, she envisioned herself in a "dream state" going into Patrick's room, and saying something to Patrick. When he tried to get up, she pushed him down. Patrick responded by grabbing her hair. In her dream, defendant saw herself standing on Patrick's bed and also standing on him because "the rage came down, because he tried to get up." In yet another statement introduced at trial, defendant testified that Patrick was trying to commit suicide with the knife, so she went into his room to show him how to do it. (The contents of these statements and the circumstances surrounding the taking of the statements will be more fully addressed in Assignment of Error No. 1).
In addition to introducing the testimony of police officers and Hurst, as well as the statements of defendant, the state called several expert witnesses to testify at trial.
After being accepted as an expert in the field of forensic pathology, Dr. Susan Garcia of the Jefferson Parish Coroner's Office testified that she performed an autopsy on the victim. She described the injuries she saw on the victim's body, but concluded that all of these wounds were superficial cuts and not life threatening. It was her opinion that the cause of death was suffocation. In addition, she took both anal and oral swabs of the victim to determine whether any recent sexual *1181 activity had occurred. Even though the anal orifice was dilated, there was no indication of recent injury or trauma to the rectum.
The state also called Dr. Michael West who testified as an expert in wound pattern analysis. Dr. West was asked to do a comparison of a pair of shoes seized from the apartment to an injury on the victim's abdomen. Taking into account the shape, style and pattern of the shoe, it was Dr. West's opinion that the shoe was highly consistent with the object that left the imprint on the victim's abdomen. Dr. West was also asked to examine a knife found on the scene and compare it to the wound patterns on the victim's body. He testified that the pattern on the knife was highly consistent with the wound patterns found on the victim's body.
The state also presented the testimony of two witnesses, Dawn Duvoisin and Diane Hill Nelson, who spoke to defendant while they were incarcerated at the Jefferson Parish Correctional Center in July 1991. Dawn Duvoisin testified that she spoke to defendant on July 18, 1991, and asked her how her son had died. Defendant replied that he had been smothered. Several days later, when they talked again, defendant told Duvoisin that her apartment had been broken into while she and her daughter were sleeping and that whoever had broken into her apartment must have killed her son. At no point, however, did defendant accuse Hurst of killing her son. When asked to describe defendant's demeanor, she replied that her moods would quickly change. One minute defendant would appear calm and the next minute she would act strangely.
Diane Hill Nelson testified that while she was in jail, she, too, had conversations with defendant about how her son had died. Defendant told Nelson that her son had not died from stab wounds but rather that he was smothered. When Hill asked defendant how she knew the child had been smothered, defendant replied that she just knew. Hill did not ever observe defendant crying over the death of her son. At no point in her conversations with Hill did defendant accuse anyone else of the crime.
Germaine Roy testified that, on the morning of July 13, 1991, as he was going to his girlfriend's apartment, in the same building as defendant's, he observed a white male leave defendant's apartment. He described the male as having a very fair complexion, a well-trimmed mustache, well-trimmed dark brown hair, and dark eyes and wearing stonewashed blue jeans and a short sleeve white shirt. Roy further testified that when this individual passed him, he noticed that the back of his ears and neck were red. From Roy's description, a composite drawing of this male was made.
Defendant testified in her own behalf at trial. According to that testimony, after eating dinner on the evening of July 12, 1991, she, Darrell Hurst, and the two children watched television. Patrick only stayed downstairs for a little while because he went upstairs to play Nintendo. However, at about 11:30 p.m., he came down and mentioned something about a dream he had that they were in a restaurant and his mother turned into a monster and was after him. Not paying much attention to Patrick's description of the dream, defendant went into the kitchen to get a beer. When she came back, Hurst and Patrick were joking and talking about limousines and girls. Defendant denied going into the kitchen and getting a knife. She also denied that she and Patrick had an argument that night about drinking. She admitted drinking a six pack of beer but denied that she was drunk. According to defendant, Hurst went to bed first that night, followed by Patrick, Charlene and then herself. Defendant claimed that she slept through the night until the next morning and did not remember ever getting up during the night. The next morning when she went upstairs to wake Patrick, he was covered with the blankets. After she pulled down the blankets, she turned him over and noticed puffiness all around his nose and discoloration on his body. She then ran to the phone and called 911. When the police arrived, she ran upstairs and showed them where Patrick was. Eventually defendant went to the police station and gave a series of *1182 statements over the next several days. Defendant testified that during this initial time frame, she did not think that Hurst was involved in her son's death. However, she claimed that after reading a newspaper article on the incident several days later, she realized that Hurst had told several lies, and she became suspicious. On cross-examination, defendant testified that she did not remember what happened on July 13, 1991, but stated that she fabricated a story consistent with what the police told her the evidence was.
Defense counsel also called as a witness Keith Hebert, an employee at the Roundup Bar in the French Quarter. Hebert identified the composite drawing of the person allegedly seen by Germaine Roy leaving defendant's apartment on the morning of July 13, 1991 as a patron who frequented the Roundup Bar for about a year beginning sometime around Mardi Gras 1991. Hebert also identified a photograph of Darrell Hurst, as depicting a gay male prostitute who also visited the Roundup Bar during that same time frame. Hebert testified that he had seen these men together an average of two or three times a week at the bar. Although he had never seen them arrive at the bar together, he had seen them leave together.
Defense counsel called two expert witnesses on defendant's behalf. Dr. Chris Sperry, an expert pathologist, testified that after reviewing photographs, autopsy reports, crime lab reports, and Dr. West's report, he was of the opinion that the cause of Patrick's death was asphyxia due to strangulation rather than suffocation. He also expressed his opinion that the marks on the child's abdomen were the result of the irregular settling of blood and that a "stomping injury" to the stomach would have produced internal injuries of which there were none.
As its last witness, defense counsel called Ron Singer, who testified as an expert in the field of footwear and impression evidence, crime scene reconstruction, and crime lab technique and procedure. After reviewing various photographs, reports, and the pair of hiking boots, it was his opinion that there was no reasonable correlation between the pattern on the victim's abdomen and the sole pattern produced by the shoes. He further testified that it is not normal crime lab procedure to wait four or five months, as was done in the instant case, to perform tests to confirm the presence of seminal fluid. On cross-examination, Singer admitted that, although he did not see the knife, he issued an opinion that it could not be determined whether the knife made the lacerations and abrasions on the victim's body.
As a rebuttal witness, the state offered the testimony of Kenneth Petite, a bartender at the Roundup Bar in the French Quarter. After being shown the composite drawing of the individual allegedly seen leaving defendant's apartment and the photograph of Hurst, Petite testified that he did not recall seeing either individual as a regular customer in the bar during the time frame from March 1991 through the end of summer 1991.
After listening to the previously set forth testimony, the jury returned with a verdict of guilty of manslaughter.

ASSIGNMENT OF ERROR NUMBER ONE
The trial court erred in denying appellant's motion to suppress the confession.

DISCUSSION
After considering the evidence presented at the suppression hearing, the trial judge denied defendant's motion to suppress confession, stating as follows:
In as far as the other testimony there isI see no evidence to suggest that she was coerced into making any statement. Most of the testimony is that she was calm and unremorseful. However, there has been some testimony, yes, that she was crying and she was upset, as I think would be natural for anyone at that time, simply by virtue of the death of her son.
The following discussion relates the circumstances surrounding the taking of defendant's statements.
*1183 On July 13, 1991, at approximately 5:30 p.m. Detective Grey Thurman, a homicide investigator with the Jefferson Parish Sheriff's Office, conducted an interview with defendant at the investigation bureau. At approximately 5:35 p.m., he executed a rights form with defendant prior to taking her statement. He advised defendant of all her rights as listed on the form, including her right to a lawyer and a right to stop answering questions at any time. According to Officer Thurman, defendant indicated that she understood her rights and wished to waive them. In regard to this statement, Thurman testified that defendant was very cooperative and continuously expressed a desire to help the police in an effort to find out what had happened to her son. During Thurman's discussions with defendant, she did not appear to be under the influence of any drugs or narcotics, nor did she appear to be suffering from any mental defect or illness. He did not use any threats, force, intimidation, or coercion against defendant to obtain this statement. He spoke with defendant from 5:35 to 6:10 p.m. and then obtained a tape recorder to take her statement. At no point did defendant request an attorney. Patrick's death was still unclassified at this stage. This first statement given by defendant consisted of some general information, such as facts about defendant's family, her relationship with Hurst, and her relationship with her children. The statement also went into the events which occurred on July 12 and July 13, 1991, up until the time she found Patrick's body. However, in this statement, defendant did not claim to know anything about the actual killing but only remembered going to bed that night.
Lieutenant Steve Buras, Commander of the Homicide Division of the Jefferson Parish Sheriff's Office, also took a statement from defendant on July 13, 1991 at approximately 9:00 p.m. Prior to taking a statement from her, Lieutenant Buras spoke to Detective Thurman who informed him that he had already advised defendant of her Miranda rights. Since defendant had just recently been advised of her rights, Lieutenant Buras did not see a need to execute another form, but he told defendant that she was under the same restraint or same agreement signed earlier with Detective Thurman.
According to Lieutenant Buras, during the course of his interview with defendant, she did not appear to be suffering from any mental defect or illness, nor did she appear to be under any sort of stress that would have prevented her from understanding what was going on. He further testified that defendant did not appear to be under the influence of drugs or narcotics and she did not look sleepy. According to Lieutenant Buras, defendant was very cooperative and did not display a lot of emotional distress over what had occurred. He did not use any threats, coercion, duress or promises to force defendant to give this statement. At no point in their conversation did defendant ask to use the phone or to speak with an attorney.
In the portion of this tape that was audible, defendant described what was watched on television at her apartment on the night of this incident, what time various individuals went to bed and who went to bed first.
Detective Valencia Stallworth, assigned to the personal violence section of the Jefferson Parish Sheriff's Office, also had occasion to speak with defendant in the early morning hours of July 14, 1991. She was originally called to the detective bureau to interview four year old Charlene Van Winkle. After her interview with the child, Detective Stallworth spoke to defendant and asked her to lay down with her daughter so that Charlene might get some rest. At approximately 3:30 a.m., Detective Stallworth went in to check on defendant because she saw her alone in the interview room crying. Prior to her conversation with defendant, she had learned from Lieutenant Buras that defendant had already been advised of her Miranda rights. However, Detective Stallworth again went over defendant's rights with her verbally, and emphasized that defendant did not have to talk to her and that anything defendant would say to her as a police officer could be used against her. After the officer discussed *1184 defendant's constitutional rights with her, including her right to an attorney, defendant indicated that she understood these rights. Stallworth testified that defendant did not appear to be under the influence of alcohol or narcotics nor did she appear to be suffering from sleep deprivation. Defendant was coherent and at no point did she request to speak to an attorney. Stallworth did not threaten or use force against defendant in order to get her to talk. They first talked about general background information including her children, her employment and her relationship with Darrell Hurst. They then discussed the circumstances surrounding the evening of July 12, 1991. During the course of their conversation, Detective Stallworth left the room. Apparently Sergeant Pernia from the homicide division of the Jefferson Parish Sheriff's Office, entered the room and told defendant that she did not believe that defendant had no knowledge of what had happened to her son. Defendant did not make any statement in response to Sergeant Pernia, but she did get very angry.
When Stallworth returned to the room, she saw that defendant was crying and asked her what was wrong. When defendant replied that they, referring to some officers, thought she killed her son, Detective Stallworth told defendant to open up and talk about what was on her mind. At that point, defendant told Stallworth that she was not sure what had happened because she was in a "dream state." In this dream state, defendant recalled going into Patrick's room, turning the lights on and looking at Patrick's face. When Patrick said something and attempted to get off the bed, defendant said, "No, not this time. The rage is much stronger than you this time." When the officer asked defendant what did she do to keep Patrick down, she replied that she must have stood on him and that must have been what those marks were on his stomach. Defendant also told her that she thought it was at this point that the flag came off the wall. Defendant then said that Patrick tried to get up and he grabbed defendant's hair. Defendant then became visibly upset and started trembling. She told the officer that she did not know what had happened next. Stallworth then advised Lieutenant Buras of what defendant had said and they decided to take another taped statement from defendant.
After executing a rights form with defendant, Detective Stallworth, in the presence of Lieutenant Buras, took a taped statement from defendant which lasted about twenty minutes. This statement basically covered the substance of what defendant had told Detective Stallworth in their previous oral interview. Detective Stallworth remained with defendant until about 12:00 noon Sunday, when she was brought over to the Correctional Center for booking.
Defendant was picked up from the Correctional Center at approximately 11:00 p.m. on July 15, 1991 and subsequently gave Detective Grey Thurman two more taped statements, one at 3:35 a.m. and the other at 3:55 a.m. on July 16, 1991. Prior to giving these July 16, 1991 statements, defendant was fully advised of her rights and she executed a rights form indicating that she understood her rights and wished to waive them. According to Detective Thurman, defendant did not request an attorney prior to, during, or after the giving of the July 16, 1991 statements. Thurman also testified that during this time frame, defendant did not appear to be under the influence of drugs or alcohol, nor did she appear to be suffering from any sleep deprivation or mental defect that would render her incapable of understanding her rights. In addition, Thurman denied using any force, coercion, promises, threats, or intimidation against her in order to get her to give these statements.
In the first statement on this date, defendant claimed that her son was going to commit suicide with a knife and that she was going to show him how to do it. After this statement Detective Thurman left the room. At that point, Detective Pernia entered the room and told defendant that she had information indicating that defendant was in fact the perpetrator and that she thought defendant was lying. Pernia then asked defendant *1185 if the incident was planned or if it just happened in a fit of rage. Defendant replied that it was manslaughter, that it happened in a fit of rage. Pernia testified at trial that, although she raised her voice to defendant, she did not intimidate, threaten or harass her. After defendant gave Pernia this verbal confession, Pernia left the room. Thurman re-entered and took the final taped statement from defendant.
In this final taped statement, defendant talked about the circumstances surrounding her son's death. She claimed that she had gone to bed that night and all of a sudden woke up because she saw that something was going on in her son's room. When she went in to look, she saw that Patrick had a knife and that he was going to commit suicide. When Patrick started talking about defendant's drinking and his wish to commit suicide, defendant became upset, took the knife away, and said "I want to show you how it's done." Patrick started grabbing at his mother trying to stop her. It was at that point that Patrick was cut with the knife. Defendant then stopped, threw the knife on the floor and told Patrick that if he wanted the knife he would have to go and get it. According to defendant, she then left the room.
After this statement, defendant was brought back to the Correctional Center, at which point the officer saw a letter from attorney Robert Toale indicating that he was representing defendant. The officers stopped any further questioning of defendant after knowledge that she had an attorney appointed to represent her.
Defendant now contends that since she had an attorney appointed to represent her as of 9:00 a.m. on July 15, 1991, the police should not have maintained any further communication with her without the knowledge and consent of counsel. Thus, any statements made after 9:00 a.m. on July 15, which include two recorded statements to Detective Thurman on the morning of July 16 as well as the verbal admission of manslaughter made to Detective Pernia that same morning, should have been suppressed, even though they were preceded by purported waivers.
From the testimony elicited at trial, it appears that on July 15, 1991, defendant met with Cesar Vazquez, an attorney for the Indigent Defender Board. Vazquez testified that he was a screening attorney for the I.D.B. and his main function was to attend magistrate court every morning at the Correctional Center to serve as I.D.B. counsel. He also determined if the inmate required indigent defender counsel. On July 15, 1991, at approximately 9:00 a.m., Mr. Vazquez met with defendant, advised her of the charges against her and the amount of bond. When defendant told Vazquez that she had already spoken to police officers, he advised her not to say anything further until she had a chance to consult with an attorney or to have an attorney present with her. She became upset and told Vazquez that she needed to find out what happened to her son. At this point, defendant became very emotional. Vazquez again told her not to speak to police officers or detectives without an attorney. Despite this advice, defendant gave two more taped statements to Detective Thurman as well as a verbal statement to Detective Pernia.
Before a confession or inculpatory statement may be introduced into evidence, the state must prove beyond a reasonable doubt that the statement was free and voluntary and not made under the influence of fear, duress, intimidation, menaces, threats, inducements or promises. LSA-R.S. 15:451; LSA-C.Cr.P. art. 703(D); State v. Vaccaro, 411 So.2d 415 (La.1982); State v. Pittman, 585 So.2d 591 (La.App. 5th Cir.1991), writ denied, 586 So.2d 545 (La.1991). If the statement was elicited during custodial interrogation the state must also show that defendant was advised of his constitutional rights as set forth in Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). State v. Castillo, 389 So.2d 1307 (La.1980), cert. den., 453 U.S. 922, 101 S.Ct. 3159, 69 L.Ed.2d 1004 (1981); State v. Crook, 517 So.2d 1131 (La.App. 5th Cir.1987), writ denied, 541 So.2d 885 (La.1989).
*1186 Whenever a statement is taken without the presence of an attorney, a heavy burden rests upon the State to demonstrate that the accused knowingly and intelligently waived his privilege against self-incrimination and his right to have counsel present. State v. Davis, 407 So.2d 666 (La.1981); State v. Crook, supra.
Allegations of specific instances of police misconduct in reference to a statement must be specifically rebutted; the state may not rely on general disclaimers of inducements or promises. State v. Serrato, 424 So.2d 214 (La.1982). The state need not wait until after the defendant's case-in-chief to meet allegations, but may anticipatorily rebut a defendant's allegations. State v. Vessell, 450 So.2d 938 (La.1984); State v. Crook, supra.
In deciding the admissibility of a confession, the trial judge must consider the totality of the circumstances. State v. Serrato, supra; State v. Pittman, supra. His decision in this regard is entitled to great weight and will not be overturned on appeal unless it is not supported by the evidence. State v. Benoit, 440 So.2d 129 (La.1983); State v. Pittman, supra.
Defendant relies solely on State v. Hattaway, 621 So.2d 796 (La.1993) to support her argument that her constitutional right to counsel was violated. In Hattaway, the question presented was whether "after the initiation of adverse judicial criminal proceedings against a defendant and subsequent to the trial court's appointment of counsel to assist him, the state violated the defendant's state constitutional right to counsel by disregarding the appointment, obtaining a waiver, and eliciting a confession from the defendant while he was without the presence or assistance of his attorney." State v. Hattaway, supra at p. 798.
After comparing Hattaway to the present case and looking at the factual differences, it does not appear that defendant's right to counsel was violated considering the circumstances presented herein. In the instant case, defendant's right to counsel attached at her first magistrate hearing, at which time she had the assistance of I.D.B. attorney, Cesar Vazquez, who was not her appointed counsel. Robert Toale was appointed to represent defendant by court order dated July 17, 1991, subsequent to her statements. As soon as the police were informed by a letter that she was represented, they ceased any further interrogation.
Moreover, defendant, in her own testimony at trial, indicated that the police treated her well and did not threaten her in any way. By her own choice, she cooperated with the police at all times and remembers signing the forms in which she waived her right to speak to an attorney.
In accord with the principles enunciated in State v. Hattaway, supra, defendant's right to counsel was honored by the police officers as is evidenced by testimony elicited both at the suppression hearing and at trial. Since her statements were not taken in violation of her constitutional rights, it appears that the trial judge properly denied the motion to suppress confession.
This assignment lacks merit.

ASSIGNMENT OF ERROR NUMBER TWO
The trial court erred in denying appellant the opportunity to present her defense and cross-examine her accusers.

DISCUSSION
At trial, the defense attempted to prove that Patrick's killer was Darrell Hurst, and more specifically that Hurst was a homosexual prostitute who frequented the French Quarter and that he and another male killed Patrick accidentally or intentionally during forced homosexual activity. In order to establish this defense, defendant attempted to prove that Patrick had been anally penetrated at some point in time; and that Hurst was in fact a homosexual "hustler." Defendant complains that the trial court erred in prohibiting this line of inquiry.
During a conference in chambers, prior to the cross-examination of Darrell Hurst, defense *1187 counsel expressed his intent to ask Hurst questions concerning his sexual orientation and activities. In response, the state requested that the line of questioning be prohibited, citing as authority for its position, LSA-C.E. arts. 607 and 608 and State v. Fleming, 574 So.2d 486 (La.App. 4th Cir. 1991), writ denied, 592 So.2d 1313 (La.1992). Defense counsel then asserted that he was not attempting to introduce this testimony to show that Hurst was a bad person, but to present a defense for his client. After considering the argument of counsel, the trial judge ruled that this line of questioning was prohibited by the Code of Evidence. Defendant also complains because during the cross-examination of Hurst, the trial judge prohibited her from asking if Hurst frequented bars in the French Quarter and also prohibited her from inquiring as to Hurst's source of income.
In addition to complaining about the limitation the trial judge placed on her during the cross-examination of Hurst, defendant also complains about being limited in her examination of several other witnesses. Specifically, defendant alleges that the trial court prohibited her from requesting Pamela Williams to explain to the jury that the absence of sperm in the oral and anal swabs taken from the victim did not disprove sexual intercourse. The court also prohibited her from questioning Dr. Susan Garcia, the coroner, about the condition of the victim's anal orifice, in order to establish evidence of on-going sexual conduct. Defendant lastly alleges that her right to present a defense and to cross-examination was impaired when the trial judge refused to let Keith Hebert, A Roundup bartender, explain what he meant when he described the bar as a "hustler bar," and also when the trial judge refused to let Kenneth Petite, another Roundup bartender, answer her inquiry about whether the bar's clientele was predominantly "gay" or if "men... meet other men" there.
Defendant alleges that despite her constitutional guarantees to present a defense and to cross-examination, the trial court continually prohibited her from presenting evidence in support of her defense by sustaining the state's relevancy objections. She further alleges that given the weakness of the evidence against her, the trial court committed reversible error by preventing her from effectively presenting her defense.
LSA-Const. Art. I, § 16 provides, in pertinent part that: "An accused is entitled to confront and cross-examine the witnesses against him, to compel the attendance of witnesses, to present a defense, and to testify in his own behalf."
The Sixth Amendment of the U.S. Constitution and LSA-Const. Art. I, § 16 (1974) guarantee an accused in a criminal prosecution the right to be confronted with the witnesses against him. Confrontation, for constitutional purposes, means more than being allowed to attend the trial and hear the witnesses. "The main and essential purpose of confrontation is to secure for the opponent the opportunity of cross-examination." Davis v. Alaska, 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974). Cross-examination is the primary means by which the believability of a witness and the truth of his testimony are tested. State v. Hillard, 398 So.2d 1057 (La.1981), appeal after remand, 421 So.2d 220 (La.1982). State v. Lard, 568 So.2d 629 (La.App. 2nd Cir.1990).
However, the extent of cross-examination is not without limitation. In order for evidence to be admissible at trial, it must be relevant. The determination concerning relevancy of tendered evidence, and therefore the scope and extent of cross-examination, is within the discretion of the trial judge whose rulings will not be disturbed in the absence of an abuse of discretion. State v. Lard, supra; State v. Fleming, supra.
In addition, an accused has a constitutional right to present a defense. Washington v. Texas, 388 U.S. 14, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1967); State v. Hamilton, 441 So.2d 1192 (La.1983); State v. Carter, 570 So.2d 234 (La.App. 5th Cir.1990). However, *1188 this right does not require a trial court to permit the introduction of evidence that is irrelevant or has so little probative value that is substantially outweighed by other legitimate considerations in the administration of justice. State v. Carter, supra.
"Relevant evidence" is defined in LSA-C.E. art. 401 as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." All relevant evidence is admissible, except as otherwise provided by the Constitution of the United States, the Constitution of Louisiana, this Code of Evidence, or other legislation. LSA-C.E. art. 402.
However, determining that evidence is relevant is only one step in determining whether it is admissible. Even relevant evidence may be excluded if its probative value is substantially outweighed by other legitimate considerations in the administration of justice. State v. Mosby, 595 So.2d 1135 (La. 1992). LSA-C.E. art. 403 states that "although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by consideration of undue delay, or waste of time."
Ultimately, questions of relevancy and admissibility are discretion calls for the trial judge. His determinations regarding relevancy and admissibility should not be overturned absent a clear abuse of discretion. State v. Mosby, supra.
In the present case, the trial judge did not err in prohibiting questioning relating to Hurst's alleged sexual preferences and homosexual activity, since this evidence was not relevant and since there was no proof that any type of homosexual activity had occurred during the time frame surrounding the murder. Although the judge refused to allow this particular line of questioning, defendant was allowed to present testimony and to cross-examine witnesses regarding her defense. Specifically, defendant was allowed to elicit testimony about Hurst frequenting a bar in the French Quarter, and being seen leaving with another man whose composite was identified by a defense witness as an individual he saw leaving the back apartment of 572 Terry Parkway in the early morning hours of July 13, 1991.
In addition, the trial judge did allow testimony about the condition of the victim's anal orifice although he did not allow defense counsel to dwell on the issue after Dr. Garcia testified that there was no indication of recent trauma to the area. Also Pamela Williams was allowed to testify that there was a possibility that an individual may have ejaculated, but not have sperm due to some medical condition. As seen by the foregoing discussion, defendant's allegations that she was not allowed to present her defense or to effectively cross-examine the witnesses, is not supported by the transcript.
See State v. Porretto, 468 So.2d 1142 (La. 1985), where the Louisiana Supreme Court held that although impeachment testimony which defendant presented in an attempt to establish that state witness had homosexual relationship with one impeachment witness was arguably relevant to defense theory that state witness and impeachment witness were involved in the murder, the probative value of such evidence was so outweighed by danger of unfair prejudice, confusion of the issues and undue delay, that it was inadmissible either as direct evidence or for impeachment purposes.
Accordingly, this assignment lacks merit.

ASSIGNMENT OF ERROR NUMBER THREE
The trial court erred in prohibiting appellant from presenting evidence concerning her mental condition at the time of the various statements obtained from her.

DISCUSSION
During the presentation of his case, defense counsel called Dr. Richard Richoux who examined defendant in his capacity as a psychiatrist on contract to the Jefferson Parish *1189 Correctional Center. While Dr. Richoux was permitted to testify about defendant's demeanor when he saw her on July 15, 1991, the trial judge did not allow him to testify as to any psychiatric diagnosis he might have made of her condition, relying on State v. Allen, 526 So.2d 1198 (La.App. 3rd Cir.1988), reversed on other grounds, 539 So.2d 1232 (La.1989).
At this point, defense counsel made a proffer of some of his testimony outside the presence of the jury. In the proffer, Dr. Richoux testified that it was his opinion that on July 15, 1991, defendant was suffering from mental illness with psychotic features. While he testified that defendant would have been able to make a voluntary statement to police, her condition would have precluded her from making an intelligent statement. He additionally testified in the proffer that he felt that defendant could have been led into making those statements by the police.
Mark Zimmerman was also called to testify outside the presence of the jury as an expert in psychology. In his proffer, Zimmerman testified that in connection with forming a psychological opinion on defendant, he examined defendant on February 8, and March 14, 1992; he reviewed statements defendant gave to police, the 911 tape and various medical records; he spoke to Dr. Richoux and the nurse who first suggested that defendant undergo a psychiatric evaluation; and he conducted his own battery of tests. Zimmerman initially found that defendant was functioning in the low to normal range of intelligence and that there were some signs of perceptual motor problems. Her personality structure was found to be within normal limits, although she seemed to be suffering from paranoia, some fears and anger at the time of the evaluation. She also registered high on one of the suicidal scales administered to her. It was his further opinion that defendant was the type of person who would try to please other people, that she tries to be socially acceptable, that she has a very poor self esteem and a negative self concept. In explaining how defendant could give a statement that was not true, Dr. Zimmerman testified that defendant would do it in an attempt to please the police.
LSA-C.Cr.P. art. 651 provides in part that "when a defendant is tried upon a plea of not guilty", evidence of insanity or mental defect at the time of the offense shall not be admissible." Under this article, evidence of a mental condition or defect is not admissible when defendant fails to plead not guilty and not guilty by reason of insanity. State v. Leatherwood, 411 So.2d 29 (La.1982).
Defendant now contends that the trial court erred in prohibiting her from presenting evidence concerning her mental condition at the time various statements were given by her to the police officers. Defendant argues that because the evidence concerned her mental condition at the time of her statements as opposed to the time of the commission of the crime, the trial judge should have permitted the testimony.
Relying on State v. Allen, supra, as the trial judge did, he was correct in not allowing testimony of these two doctors regarding defendant's mental state at the time of the statements since defendant did not plead not guilty and not guilty by reason of insanity, LSA-C.Cr.P. art. 651, nor serve notice on the district attorney, LSA-C.Cr.P. art. 726. Even though the statements were not contemporaneous with the offense, they were close enough in time so that the experts would basically also be testifying concerning defendant's mental state at the time of the commission of the offense.
Moreover, this procedure of attacking the admissibility of an inculpatory statement is no longer authorized by LSA-C.Cr.P. art. 703(F) which reads as follows:
F. A ruling prior to trial on the merits, upon a motion to suppress, is binding at the trial. Failure to file a motion to suppress evidence in accordance with this Article prevents the defendant from objecting to its admissibility at the trial on the merits on a ground assertable by a motion to suppress.
Following an adverse ruling on the motion, the defendant may seek supervisory relief or *1190 address the matter on appeal. At trial, the introduction of evidence concerning the circumstances surrounding the taking of the statement is only to enable the jury to determine the weight to be given the statement. LSA-C.Cr.P. art. 703(G). The predicate should not provide another opportunity to attack the admissibility of the statement. State v. Brown, 445 So.2d 456 (La.App. 5th Cir.1984).
In the present, as in State v. Brown, supra, defendant should have called these two witnesses to testify at the suppression hearing in her attempt to show the statements were not free and voluntary due to defendant's mental condition at the time they were given. Moreover, even if the testimony of these doctors at trial on the proffer is considered, the State still met its burden of proof in regards to the admissibility of the statements.
Thus, looking at either theory set forth above, that defendant was precluded from introducing the testimony pursuant to LSA-C.Cr.P. art. 651, or that this procedure was not the proper method for attacking the admissibility of a confession pursuant to LSA-C.Cr.P. art. 703(F), this assignment lacks merit.

ASSIGNMENT OF ERROR NUMBER FOUR
Also assigned as error are any and all errors patent on the face of the record.

DISCUSSION
La.C.Cr.P. art. 920 provides: "the following matters and no others shall be considered on appeal: (1) An error designated in the assignments of error; and (2) An error that is discoverable by a mere inspection of the pleadings and proceedings and without inspection of the evidence."
For the purpose of an error patent review the "record" in a criminal case includes the caption, the time and place of holding court, the indictment or information and the endorsement thereon, the arraignment, the plea of the accused, the bill of particulars filed in connection with a short form indictment or information, the mentioning of the impaneling of the jury, the minute entry reflecting sequestration in a capital case, the verdict, and the judgment or sentence. See State v. Oliveaux, 312 So.2d 337 (La.1975) and State v. Pittman, supra.
A review of the record reveals no errors patent.

DECREE
For the foregoing reasons, the defendant's conviction and sentence are affirmed.
AFFIRMED.